734 So.2d 89 (1999)
STATE of Louisiana
v.
Clemone W. LANIEU.
No. 98 KA 1260.
Court of Appeal of Louisiana, First Circuit.
April 1, 1999.
*90 Victor J. Woods, Jr., Alvin F. Landry, Assistant District Attorneys, Port Allen, for Appellee, State of Louisiana.
John M. Bemiss, Jr., Assistant Indigent Defender, Port Allen, Paul C. Marx, Louisiana Appellate Project, Lafayette, for Defendant/Appellant, Clemone W. Lanieu.
Before: CARTER, C.J., SHORTESS, and WHIPPLE, JJ.
CARTER, C.J.
The defendant, Clemone W. Lanieu, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. He pled not guilty and, after *91 trial by jury, was found guilty of the responsive verdict of manslaughter, a violation of LSA-R.S. 14:31. He subsequently was sentenced to forty years at hard labor. He has appealed, urging five assignments of error.

FACTS
On June 30, 1995, the defendant shot the victim, Tyrone Butler, twice in the head, after an argument wherein the men cursed at each other in front of the defendant's home in West Baton Rouge Parish. Prior to the shooting, the victim had argued with the defendant, backed his car into the defendant's driveway, and opened the car door. The defendant then reached in through the passenger side window of the victim's car and pointed a gun at the victim's head. The victim told the defendant to shoot him and the defendant shot the victim in the head. After a pause, the defendant shot the victim a second time in the head. After shooting the victim, the defendant drove off in the victim's car with the victim's body in the car and dumped the body in a field. The defendant was arrested after being stopped by the police.
Prior to the date in question, the defendant and victim were acquaintances, but had had a disagreement regarding a car owned by the defendant, but sold to a third party by the victim. The defendant claimed that prior to the shooting, he saw the victim reach down in the car and saw the handle of what appeared to be a gun. Michael Ardoin, who was in the front passenger seat of the vehicle when the victim was shot, testified that the victim did not reach for a gun and he did not see the victim with a gun on that day. Gerrod Thomas, who was also in the victim's car at the time of the shooting, testified that he did not see the victim with a gun that day.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant contends that the trial court erred in allowing into evidence, and the playing of, taped interviews of Gerrod Thomas and Carolyn Clayton. In his brief to this court, the defendant argues that the State did not prove that Thomas was unable to refresh his memory from the tape. He contends that if Thomas's memory was refreshed after hearing the tape, then the recording should not have been played before the jury. He contends that even if the prosecutor was attempting to impeach Thomas, he failed to follow the proper procedures. The defendant further contends that the reliability of Clayton's statement was questioned as she did not remember making the statement, and claimed she was under the influence of drugs and alcohol at the time. He contends that there was a question as to whether Clayton's statement was an accurate reflection of her knowledge. Furthermore, the defendant contends that the statement contains highly prejudicial material and its prejudicial effect is greatly outweighed by its probative value.
Evidence of a witness's prior inconsistent statement is admissible when offered to attack the witness's credibility, unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. LSA-C.E. art. 607 D(2). A prior inconsistent statement by a witness may be considered for impeachment purposes only, and not as substantive evidence of a defendant's guilt (unless the statement otherwise qualifies for admission as non-hearsay or fits within an exception to the hearsay rule). State v. Nedd, 93-1906, p. 6 (La. App. 1st Cir.11/10/94); 647 So.2d 346, 349-50.
A witness may be confronted with his own prior statement which is inconsistent with his current testimony when the proper foundation required by LSA-C.E. art. 613 has been laid. The witness's attention must be "fairly directed" to the statement, and the witness must be given the opportunity to admit the "fact" of the statement. *92 Extrinsic evidence of the prior contradictory statement is admissible only if the witness denies making the particular statement. LSA-C.E. art. 613. Nedd, 647 So.2d at 350.
In the instant case, during the testimony of Gerrod Thomas, he was asked if he talked to the defendant about "leaving this alone." Thomas responded that he told him, "[y'all] just try to resolve this and just leave it alone." The prosecutor asked Thomas if he remembered exactly what he told the defendant and Thomas responded, "I can't recall all the way but I can tell you some things I think I had said." The prosecutor then asked Thomas if he remembered giving a statement to police officers on July 6, 1995, to which he responded that he recalled the date. At this point, the prosecutor asked Thomas to read from a piece of paper. However, defense counsel argued that there was a tape recording of the witness's statement and that the best evidence was the statement. The prosecutor argued that at this point, he indicated that he was only trying to have the witness refresh his memory. The trial court allowed Thomas to read the statement to which defense counsel objected.
After he read the statement to himself, Thomas indicated that he remembered giving the statement and that he remembered what he told the defendant. When asked what he told the defendant, he stated that he told him, "just leave it alone" and "I would try to resolve it ... before anything bad might happen." The prosecutor then asked what were the words he used when telling that to the officers and Thomas indicated he would have to look at the statement. At this point, defense counsel argued that the written statement was not certified and that the best evidence of his statement would be the tape recording. The prosecutor asked for a short recess in order to play the taped statement for Thomas. The prosecutor also asked that the taped statement be allowed into evidence because Thomas was unresponsive and the tape shows the true statements at the time they were made. The prosecutor contended that, while Thomas stated that he told the defendant to just leave the matter alone, in the taped statement, he stated that he told the defendant that "[the victim] wasn't going to kill him."
After the tape was played, Thomas admitted that he was the person who made the statement but explained that it was only his opinion. Defense counsel then argued that the problem with the taped statement was that "Hotard" was testifying and the defense was unable to cross-examine Hotard[1] at that time. The prosecutor explained that on the tape Hotard was only asking a leading question, which the prosecutor would have been allowed to do.[2] The prosecutor indicated that he wanted to limit the playing of the taped statement to only what he specifically asked Thomas at trial, regarding his statement, and to what Thomas failed to testify to accurately. At that point, defense counsel stated, "Okay. I'll have him explain later." Defense counsel then appeared to object to the court's allowance of the taped statement into evidence with Hotard's voice on the tape as he claimed that this was irrelevant under LSA-C.E. art. 612 C. The court allowed the statement into evidence pursuant to LSA-C.E. art. 803(5).
The taped statement was subsequently played for the jury. The portion the statement played for the jury consisted of the following:

*93 Hotard: Isn't it a fact that Clemone had told you, prior to this, that he was going to kill Tyrone?
Mr. Thomas: He had mentioned it before. He just saidyou know, he was just mad about what happened about the car. And you know, but it came out of his mouth, because I had told him, you know, just leave it alone because it ain't killing, do you know what I'm saying, Tyrone, it ain't even worth it. I told him because most likely somebody else is most probably going to do it one day, you what I'm saying, because a lot of people don't like him. And I heard a few times that somebody was already after him to kill him, you know. So I told him he can just go on and leave that alone.
Subsequently, Carolyn Clayton, the defendant's mother, testified at the trial. During her testimony, she was asked if she remembered giving a statement to Detective Randy Walker of the West Baton Rouge Parish Sheriffs Office on June 30, 1995, and she stated that she did not because she was "drugged up, and alcohol...." The prosecutor asked Clayton to review a written copy of her statement but Clayton indicated that she could not read. The jury was then excused and portions of the taped statement were played for Clayton. After the playing of the statement, she stated that she did not recognize her voice from the recording and did not remember having a conversation with an officer regarding the incident. She claimed that she was under the influence of drugs at the time she gave the statement. She claimed that the voice on the tape was not hers because she did not "drag [her] voice like that."
Officer Walker was brought into the courtroom and Clayton stated that she did not recognize him and did not remember giving him a statement. Clayton was dismissed and Walker was brought to the witness stand.
Walker indicated that he was employed with the West Baton Rouge Parish Sheriffs Office and, while assisting with the investigation of the instant crime, he interviewed the defendant's mother and father. The taped statement was played and he stated that the voices on the tape belonged to him and Clayton. He testified that he conducted the interview and that the woman's voice belonged to Clayton. He identified Clayton as being the person that just left the witness stand. Walker noticed that on the day she gave the statement, Clayton appeared to be "a little shook up" because of the involvement of her son. However, he did not notice anything out of the ordinary.
The prosecutor then stated that he wanted to introduce Clayton's taped statement into evidence and play portions of that statement for the jury. Defense counsel did not object but indicated that he wanted to know which portions of the tape would be played for the jury. There was some discussion between the prosecutor and defense counsel regarding the portions of the statement to be played for the jury. At the end of their discussion, defense counsel stated that the problem with Clayton's statement was that it contains hearsay and that those portions were inadmissible. The court responded that it would allow the statement pursuant to LSA-C.E. art. 805.
Defense counsel then questioned Walker and asked him if he asked Clayton if she was under the influence of any alcohol or narcotic drug before she gave her statement. Walker responded, "No, sir. I didn't have any reason to ask her that." He stated that he only asks a person if they are under the influence only if he smells of alcohol or shows any signs of being under the influence.
At the conclusion of his questioning of Walker, defense counsel stated with regard to Clayton's statement that hearsay was inadmissible and that if Thomas told Clayton something which she says in the statement, he was unable to cross-examine Thomas about the statement. The prosecutor *94 responded that he was not trying to admit that part of the statement but, rather, that was the part that defense counsel asked be admitted during their previous discussion. Defense counsel responded, "Oh, okay." However, defense counsel then objected to that portion of the statement being played which contained Thomas's name. The prosecutor stated that he did not have a problem with stopping the tape before Clayton mentioned Thomas and did not have a problem "with just catching her comments."
Subsequently, the jury was returned to the courtroom and Clayton returned to the witness stand where she was again asked if she remembered giving a taped statement to law enforcement officers regarding the defendant and the instant incident and she indicated that she did not remember. Thereafter, portions of her taped statement were played for the jury and Clayton again stated that she did not remember making the statement.
Initially, we note that regarding Thomas's statement, at trial, the defendant objected only to the statement being irrelevant, the witness reading the written statement instead of the taped statement being played, and the statement containing testimony from Hotard. He failed to object on the specific grounds that he now raises on appeal. The reasons for the objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and prevent or cure any error. A defendant is limited on appeal to the grounds for objection articulated at trial. An assignment preserved to a trial court ruling where no basis for the objection has been stated presents nothing for appellate review. State v. McCutcheon, 93-0488, p. 10 (La.App. 1st Cir.3/11/94); 633 So.2d 1338, 1344, writ denied, 94-0834 (La.6/17/94); 638 So.2d 1093. Thus, the defendant's objection without a statement for the record of any reasons in support of the objection did not preserve this issue for appeal. Additionally, regarding Clayton's statement, we note that the only objection made by the defendant regarding the playing of the statement was his objection to playing the portion of her statement wherein she mentioned Thomas. The prosecutor agreed not to play that part of the statement. The defendant failed to object on the specific grounds that he now raises on appeal. Therefore, he is precluded from raising these arguments on appeal.
Moreover, after reviewing the introduction of the taped statements into evidence, we are unable to find that the trial court erred in allowing their introduction. Thomas was asked about what he told the law enforcement officers regarding statements made to the defendant. Even after being shown a written copy of his statement, he did not appear to remember what he said and needed to have his memory refreshed again. A portion of the tape recording relating to the information the prosecutor was attempting to obtain from Thomas was then played for the jury.
As to the introduction of the portion of Clayton's statement into evidence, she stated throughout her testimony that she did not recall giving a statement to the law enforcement officers regarding the instant incident and even after listening to her statement, contended that the voice on the tape was not hers and that she did not remember giving the statement. She indicated that she did not remember making any of the statements about the defendant to the officers. However, the officer who took her statement testified at trial that Clayton was the person who gave him the statement and he indicated that she did not appear to him to be intoxicated or on drugs. Considering the above, we are unable to find that the trial court erred in allowing the playing of the portions of the taped statements of Thomas and Clayton. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant contends that the trial court *95 erred in refusing to give defense counsel access to the presentence investigation report (PSI) prior to sentencing. In his brief to this court, the defendant argues that prior to sentencing defense counsel indicated a need to review the PSI, but that the court proceeded with sentencing without giving defense counsel an opportunity to review the report. He contends that he had a right to access to the PSI as he could not determine if his sentence was based on false information contained in the report.
A defendant does not have an absolute right to demand the PSI, but the trial court may, in its discretion, allow defendant to review it. LSA-C.Cr.P. art. 877 B. A defendant has a constitutional right, however, to rebut a PSI if it is prejudicial to his case. State v. Milstead, 95-1983, p. 5 (La.App. 1st Cir.9/27/96); 681 So.2d 1274, 1277. In order for an appellate court to review the effects of a PSI upon a defendant's sentence, the defendant must orally object, request a hearing, move to traverse, or offer countervailing information before or during the sentencing hearing. Milstead, 681 So.2d at 1277.
In the instant case, at the beginning of the sentencing hearing, the following colloquy occurred:
Mr. Bemiss [defense counsel]: If Your Honor please, we need to go over the presentence investigation report.
The Court: What do you mean "go over" it?
Mr. Bemiss: Well, I'm not allowed to look at it. And I believe the Court is
The Court: At the sentencing, the Court can inform you of the factual contents of it.
* * *
Mr. Bemiss: .... But anyway, I am not allowed by this Court to read the P.S.I. report. I do not know its contents. There may be some statements in there that are incorrect. There may be some statements in there that are prejudicial and need to be rebutted by the defendant before sentencing. And you have indicated to me in the past that you would go over the P.S.I. report and tell me of any prejudicial statements.
The Court: I don't recall telling you that I would go over the report and tell you of any prejudicial statements. I don't recall that, Counsel.
Mr. Bemiss: Well, that's the way I interpreted it, Judge.
The Court: What I do[,] when I order a P.S.I., once it is received in-hand, I do review the P.S.I. and, in compliance with Article 877 of our Code of Criminal Procedure, at the sentencing I do recite the factual contents. And when I say "factual contents," that is in connection with those contents that I can recite at the sentencing. There are certain contents which I necessarily cannot, and I'm sure you are aware of that.
Mr. Bemiss: Correct. But if there is incorrectand in the past there has been incorrect information inserted into P.S.I. reports that the Court might consider as being influential upon the Court in making its decision as to the length of sentence. And we have no way of knowing this or to be able to rebut it unless you tell us.
The Court: All right.
At this point, a victim impact statement was made by the mother of the victim. Following her statement, the defendant made a statement to the court. In sentencing the defendant, the court stated that it reviewed the PSI and stated a number of reasons upon which it was basing the defendant's sentence. The defendant did not object to the reasons as being incorrect nor did he ask for an opportunity to rebut the reasons.
Although defense counsel did express a desire to review the PSI prior to sentencing, he failed to allege with any particularity that it contained false information detrimental to the defendant. Additionally, after the court stated its reasons upon *96 which it based the defendant's sentence, the defendant failed to object to reasons stated by the court as being false and did not ask to rebut the information. Considering the above, we are unable to find that the trial court erred in failing to disclose the contents of the PSI to the defendant. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assignment of error, the defendant contends that the trial court erred in sentencing him to serve eighty-five percent of the sentence imposed prior to being eligible for parole, as this was in violation of the prohibition against application of an ex post facto law. In his brief to this court, the defendant argues that the crime for which he was convicted occurred on June 30, 1995, he was convicted on September 12, 1997, and he was sentenced on January 6, 1998; however, the act upon which the court relied in denying his parole until he had served eighty-five percent of his sentence was not effective until January 1, 1997, and was to apply only to persons convicted of offenses on or after the effective date of the act. Thus, he argues that application of the statute against him subjected him to a more severe punishment than was in effect at the time of the commission of the offense, and, thus, was an ex post facto law.
1995 La. Acts No. 1099, § 1 added to LSA-R.S. 15:574.4 B the following sentences: "Notwithstanding any other provisions of law to the contrary, a person convicted of a crime of violence and not otherwise ineligible for parole shall serve at least eighty-five percent of the sentence imposed, before being eligible for parole. The victim or victim's family shall be notified whenever the offender is to be released." According to § 2 and § 3 of this same act, the provision of this act became effective on January 1, 1997, and applied only to persons convicted of offenses on or after the effective date of this act.
Ex post facto laws are prohibited by the United States Constitution Article I, sections 9 and 10 and the Louisiana Constitution Article I, section 23. This prohibition extends to the enforcement of any enactment which changes the punishment to inflict a greater penalty than that authorized for the crime at the time of its commission. Thus, legislation which passed after the crime could not be applied to persons convicted of the offenses that were committed prior to the enactment. State v. Calhoun, 94-2568, pp. 5-6 (La. App. 1st Cir.2/23/96); 669 So.2d 1359, 1362.
The instant crime occurred in 1995 prior to the effective date of the 1995 La. Acts No. 1099, § 1. However, at the defendant's 1998 sentencing hearing, the trial court stated that because the instant offense was classified as a crime of violence LSA-R.S. 15:574.4 B applied and under that statute the defendant was eligible for parole upon serving eighty-five percent of his forty year sentence. Defense counsel then made an oral motion for reconsideration of sentence wherein he argued that the sentence was excessive and the instant crime was committed before the amendment to the statute was effective. The court denied the defendant's motion.
Application of the 1995 amendment of LSA-R.S. 15:574.4 B to the instant case exposes the defendant to the possibility of additional penalties for his criminal conduct and thus violates the constitutional prohibitions against ex post facto laws. Additionally, we note that according to recent decisions by the Louisiana Supreme Court, parole eligibility is to be determined by the Department of Corrections pursuant to LSA-R.S. 15:574.4. See State ex rel. Jones v. State, 98-0226 (La.6/19/98); 720 So.2d 1209 and State ex rel. Lewis v. State, 95-0731 (La.1/6/97); 685 So.2d 131. Accordingly, rather than vacating the sentence and remanding for resentencing, we simply delete the provision denying parole eligibility under the 1995 amendment to *97 LSA-R.S. 15:574.4 B. Cf. State v. Miller, 96-2040, p. 3 (La.App. 1st Cir.11/7/97); 703 So.2d 698, 700-01, writ denied, 98-0039 (La.5/15/98); 719 So.2d 459, and Calhoun, 669 So.2d at 1363.[3]

ASSIGNMENTS OF ERROR NUMBERS FOUR AND FIVE
In assignment of error number four, the defendant contends that the trial court failed to sufficiently articulate the factual basis for the sentence imposed. In assignment of error number five, the defendant contends that the trial court erred in imposing an excessive sentence. In his brief to this court, the defendant contends that in sentencing him, the trial court only noted his age, date of birth, that the crime involved use of a dangerous weapon, and that he had no adult criminal history or criminal record. He contends that the court failed to note any aggravating or mitigating circumstances. The defendant further argues that his sentence was excessive in light of the facts of the case. He contends that he should not have received the maximum sentence, as he was a first offender and did not meet the criteria for the maximum sentence.
The defendant was sentenced on January 6, 1998. At the conclusion of the sentencing hearing, he made an oral motion for reconsideration of sentence wherein he contested the court's ruling regarding the defendant's parole eligibility and the excessiveness of his sentence. The motion was denied by the trial court.
The penalty for a defendant convicted of manslaughter is imprisonment for not more than forty years at hard labor. See LSA-R.S. 14:31 B. Thus, the defendant's sentence of forty years at hard labor was within the statutory requirements.
Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Article I, section 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. A sentence is constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it shocks the sense of justice. The sentence imposed will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within the statutory limits. State v. Lobato, 603 So.2d 739, 751 (La. 1992).
LSA-C.Cr.P. art. 894.1 sets forth items which should be considered by the trial court before imposing sentence. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence. LSA-C.Cr.P. art. 894.1 C. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La.1990). Maximum sentences are reserved for cases involving the most serious offenses and the worst offenders. State v. Easley, 432 So.2d 910, 914 (La. App. 1st Cir.1983).
According to the trial court's reasons at sentencing, the defendant was a nineteen-year-old male who was classified as a first felony offender and charged with second degree murder. The court further noted that other than the instant offense, the defendant had no adult criminal history. However, the court indicated that the instant offense involved the use of a dangerous weapon which resulted in the death of another human being. According to the PSI, the defendant was arrested for attempted *98 second degree murder in May 1996, but the grand jury pretermitted the case. The PSI recommended that, due to the nature of the offense, the defendant not be placed on probation.
Although the trial court did not recite a full factual basis for the sentence, we find that the record supports the sentence imposed. In the instant case, after the defendant and the victim had argued and cursed at each other, the defendant reached into the victim's car, pointed his gun through the passenger side window and shot the victim, the driver of the car, twice in the head. According to the trial testimony of an expert pathologist, either gunshot wound could have killed the defendant. Additionally, at least one witness testified that there was a pause of one to three minutes between the first and second gunshot. After the shooting, the defendant left the crime scene in the victim's vehicle with the victim's body in the vehicle. He subsequently dumped the body in a field. According to the officer who eventually stopped and arrested the defendant, when he pursued the defendant and turned on his police lights and siren, the defendant fled at a high rate of speed. Additionally, we note that the defendant received a benefit when the jury chose to convict him of the lesser crime of manslaughter as the facts of this case were sufficient to convict him of the charged offense of second degree murder. See State v. Carrier, 95-1003, p. 9 (La.App. 3rd Cir.3/6/96); 670 So.2d 794, 799-800, writ denied, 96-0881 (La.9/20/96); 679 So.2d 431. Considering the above, we find the defendant to be one of the worst offenders and this crime to be one of the most serious offenses.
After reviewing the record, we are unable to find that the trial court abused its discretion in sentencing the defendant. The sentence imposed is not grossly disproportionate to the severity of the crime, in light of harm to society, or so disproportionate as to shock our sense of justice. This assignment of error is without merit.

CONCLUSION
For the above reasons, the conviction is affirmed. The sentence is amended to delete the condition that defendant serve eighty-five percent of the sentence imposed prior to being eligible for parole, and as so amended, the sentence is affirmed.
CONVICTION AFFIRMED; SENTENCE, AS AMENDED, AFFIRMED.
SHORTESS, J., concurs.
NOTES
[1] During subsequent trial testimony, it was revealed that Hotard was Detective Charles Hotard of the West Baton Rouge Parish Sheriff's Office. Hotard later testified that he was chief investigator in the instant case and indicated that he talked with the defendant about the crime.
[2] At the beginning of Thomas's testimony, the prosecutor showed that he was allowed to ask Thomas leading questions as he was identified with an adverse party, the defendant, under LSA-C.E. art. 611 C.
[3] We take this approach as this matter did not involve sentencing discretion as the trial court sentenced the defendant to the maximum sentence allowed for his conviction of manslaughter.