NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 07-58

STATE OF LOUISIANA

VERSUS

HAIMING LUO

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR103497
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN D. SAUNDERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Oswald A. Decuir, and Marc T. Amy, Judges.

AFFIRMED.

Michael Harson
District Attorney
15th Judicial District Court
P.O. Box 3306
Lafayette, LA 70502-3306
(337) 232-5170
Counsel for Plaintiff:
State of Louisiana

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2775**
**Monroe, LA 71207-2775**
**(318) 387-6124**
**Counsel for Defendant:**
**Haiming Luo**

**SAUNDERS, Judge.**

On July 14, 2004, a grand jury indicted the Defendant, Haiming Luo, with the crime of second degree murder, a violation of La.R.S. 14:30.1. On December 21, 2005, the Defendant entered a plea of guilty to the amended charge of manslaughter. He was subsequently sentenced on March 14, 2006, to serve forty years at hard labor.

A motion to reconsider sentence was filed by the Defendant on March 15, 2006. It was denied without a hearing on March 21, 2006. The Defendant is now before this court on appeal, asserting that the sentence imposed by the trial court was excessive. We affirm Defendant's sentence.

## FACTS:

The following facts were recited by the State at the Defendant's guilty plea hearing. On May 7, 2004, the Defendant and the victim, Ms. Ting Chen, were in a room at a conference center located at the University of Louisiana in Lafayette Parish. The Defendant and the victim got into an argument, and the Defendant stabbed the victim numerous times, intentionally causing her death. The Defendant subsequently left the room and the city of Lafayette.

At the Defendant's sentencing, the testimony indicated that the Defendant was studying for his Ph.D. at the University of Louisiana. Police were called to a room registered to the Defendant when people began to complain about a smell in the area. When the door was opened, the victim was found beneath a pile of clothes, towels and bedspreads, her body beginning to decompose. An autopsy of the victim revealed that she sustained ninety-seven stab wounds or cuts, twenty of which were defense wounds on her arm. The victim was also stabbed postmortem, and her throat was severely cut. The victim's entire body had lacerations.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

**ASSIGNMENT OF ERROR:**

In his assignment of error, the Defendant argues that the maximum sentence of forty years, imposed by the trial court, was excessive, in light of his background and his complete lack of a criminal record.

This court has set forth the following standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 [p.5] (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 [p. 3] (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-0838 (La. 2/1/02), 808 So.2d 331.

To decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may

provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

When sentencing the Defendant, the trial court stated:

I find this case particularly tragic, because the two individuals involved in this case, the victim and the defendant, both had very promising futures. They both apparently came from close families, they were both looked upon by their families as sort of being their legacy and their future. And that just makes it an extreme tragedy.

And it is particularly troublesome, I think, because I still am not sure that the defendant in this case realizes exactly the extent of what happened. And that may be a cultural difference. But, in reading what he wrote and in hearing some of his comments, I'm just not sure he realizes how abhorrent that behavior is in this society, in this country.

So -- And, yet, I understand the letters that were written by his friends. I understand that he has a good side, as well, too. As I said, it's very tragic, because, apparently, to many people, he was a comfort and a friend.

But certainly his behavior that resulted in the death of the victim in this case was anything but appropriate or kind or at all in keeping with the way some of his friends have described him.

So let me say that I have studied the presentence report, I have studied all of the letters that have been written, I have listened carefully to Dr. Harper's testimony, and I've considered all of these matters, as well as the nature of this offense, and I have considered this in light of Article 894.1 of the Code of Criminal Procedure. And I do make the following findings of facts regarding sentence:

Mr. Luo, although you have no prior felony convictions and it appears that you led a law-abiding life before you committed this offense, you do stand convicted of the killing of another human being.

I know that your conduct had a permanent and devastating effect upon the victim's family, as reflected in the correspondence that I

3

received from them, and I understand you are from the same country as the victim, you're familiar with its customs, and you are aware the victim in this case was an only child and would be expected to care for her parents as they age.

Your conduct during the commission of this offense manifested deliberate cruelty to the victim. Ninety-seven stab wounds and 12 defensive wounds in somebody trying to ward off an attack certainly manifests deliberate cruelty.

You used actual violence in committing this offense. You committed this offense with a dangerous weapon. And the Court finds that a lesser sentence would deprecate the seriousness of this offense.

And, while I accept Dr. Harper's testimony, I don't find that any of his testimony provides to me a basis which would excuse your conduct or in any way explain your conduct to the satisfaction of this Court.

In his motion to reconsider sentence, the Defendant maintained that the trial court failed to properly consider all of his mitigating evidence, including, but not limited to, his young age, twenty-five, at the time of the offense, and his good works and service prior to the crime. The Defendant also averred that his conduct was the result of circumstances unlikely to recur and that his imprisonment for forty years would cause excessive hardship to his family. Lastly, the Defendant maintained that the trial court failed to give adequate weight to his acceptance of responsibility and to his lack of impulse control and judgment related to a previous closed-head injury.

On appeal, the Defendant states that he is a native of China who came to the United States to study at the University of Louisiana at Lafayette for his Ph.D. He stresses that he has no prior felony record and had been a law-abiding young man prior to this offense. The Defendant also describes a head injury he suffered prior to the offense, which allegedly caused mental problems including headaches, loss of energy, difficulty speaking, an altered sense of smell, hypersalivation, body shakes,

4

lapses in attention, changes in sleep patterns and adult bed-wetting. Further, the Defendant asserts that he comes from a very distinguished family and that because he is the only child, he means the world to his parents. According to the Defendant, his parents will have no one to care for them in their old age, as it is tradition in China for the child to care for his parents as they grow old. Lastly, the Defendant stresses that he had a bright future as a scientist and that the world will be deprived of potential contributions to the scientific community.

As noted above in the trial court's reasons for ruling, the trial court considered the testimony of Dr. Donald Harper, a neurologist who examined the Defendant following the offense. The Defendant reported to Dr. Harper that he was injured in 1992 when he fell while doing gymnastics. He had fallen from about seven to eight feet against his face and chin, causing four of his upper teeth to be knocked out. His injuries caused him to miss about a week of school. He subsequently suffered a variety of problems from the fall, including headaches once a week, less energy, a change in his personality, becoming particularly quiet, changes in his thinking, wherein he would have difficulty getting words out or he would say the wrong words, a change in his sense of smell, hypersalivation, intermittent body shakes while awake, lapses in attention, talking in his sleep and bed-wetting.

Dr. Harper opined that the Defendant had a variety of physical findings that he thought were relevant to his neurological situation. The Defendant had a two centimeter long scar on his chin and implanted upper teeth compatible with his history of head injury. Dr. Harper noticed some drooping of Defendant's mouth on the right side when he spoke and some loss of definition to the nasolabial fold on the right. The Defendant's strength, as well as the sensation, in his dominant arm was

5

also considered abnormal. Further, the Defendant's hearing was decreased in both ears; however, his hearing was more decreased on the right side than the left. Additionally, Dr. Harper stated that the Defendant's affect was flat and that his emotional expression during their conversation seemed blunted compared to what he would have expected.

Next, Dr. Harper testified that the Defendant's clinical findings associated with personality change might be associated with problems controlling his behavior and interpreting social situations. Dr. Harper explained that the front part of the brain involves various kinds of actions and behaviors, and injury to the area causes problems with executive function, planning behaviors, and trying to decide the probable outcome of one's behavior. Further, Dr. Harper agreed that the frontal lobe of the brain deals with impulse control and judgment.

Dr. Harper also consulted with Ted Friedberg, who interviewed the Defendant and administered various tests. Dr. Harper testified that most of the tests were reported normal. However, some abnormalities were found on MMPI-II testing, in which the Defendant's scores fell outside of the normal range for depression and schizophrenia. Dr. Harper also received letters from family members, which described the Defendant's personality change, which he believed is also consistent with a frontal lobe injury. Within a reasonable degree of medical certainty, Dr. Harper opined that the Defendant sustained a closed-head injury to the frontal lobe.

On cross-examination, Dr. Harper clarified that the Defendant did understand that stabbing the victim ninety-seven times would result in her death and that killing someone is a crime. Dr. Harper also agreed that the Defendant was bright, cognitively intact, and able to understand, intellectually, what was going on, and to

6

work at a graduate level degree. Lastly, he agreed that the Defendant knew right from wrong.

The trial court also took into account the legacy and future of the Defendant's family upon his incarceration, the fact that he had no prior felony convictions and that he was a law-abiding person prior to the offense. The court concluded, however, that the aggravating circumstances involving the violent nature of the crime outweighed the mitigating factors involved. Further, the trial court did not accept the fact that the Defendant's head injury excused, or explained, his conduct to the court's satisfaction.

The jurisprudence reflects that the forty-year maximum penalty for manslaughter has been imposed in similar circumstances. In *State v. Jones*, 05-735 (La.App. 5 Cir. 2/27/06), 924 So.2d 1113, the defendant was charged with second degree murder, but was convicted of manslaughter. The defendant shot the victim in the face at least four times, and seven spent casings and one projectile were found at the scene. Although the defendant argued that the victim tried to slash him twice with his knife prior to the shooting, the victim's knife was found in the waistband of the victim's pants, and it was stipulated that the first shot to the victim's head was fatal. Because of the number of times the defendant shot the victim, and considering the location of the injuries, the court concluded that the maximum sentence of forty years was not excessive and unconstitutional. The court also noted that although the defendant's prior criminal history was unclear from the record, the jurisprudence supported imposing the maximum sentence for manslaughter, even for a first felony offender.

7

In *State v. Mims*, 97-1500 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, *writ denied*, 00-2255 (La. 6/22/01), 794 So.2d 781[1], the appellate court upheld the maximum forty-year sentence for the defendant's manslaughter conviction. The defendant's pre-sentence investigation report indicated that he had no prior convictions, that he had sustained successful employment since high school graduation, and that he had achieved financial success in his body shop business. Also, the defendant was two months short of his fortieth birthday at the time of sentencing. Despite the mitigating circumstances, the trial court concluded that the crime was so severe that the maximum sentence was warranted. The victim was shot at least six times, and eight spent cartridge casings were found under and around the victim's body.

In *State v. Lanieu*, 98-1260 (La.App. 1 Cir. 4/1/99), 734 So.2d 89, *writ denied*, 99-1259 (La. 10/8/99), 750 So.2d 962, the defendant, a nineteen-year-old first felony offender, was charged with second degree murder when he shot the victim twice in the head after an argument. The defendant reached in through the passenger side window of the victim's car and pointed a gun at the victim's head. The victim told the defendant to shoot him, and the defendant shot him in the head. After a pause of one to three minutes, the defendant shot the victim a second time in the head. After shooting the victim, the defendant drove off in the victim's car with the victim's body in the car and then dumped the body in a field. In affirming the trial court's sentence of forty years, the court noted that the defendant received a benefit when the jury chose to convict him of the lesser crime of manslaughter, as the facts of this case were sufficient to convict him of the charged offense of second degree murder.

_____

[1]Writs were also denied for the co-defendant in *State v. Mims*, 00-2270 (La. 6/22/01), 794 So.2d 782.

In the instant case, the Defendant pled guilty to manslaughter, a violation of La.R.S. 14:31, which states, in pertinent part, "Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." As such, the Defendant received the maximum sentence. The Defendant, however, was originally charged with second degree murder, a violation of La.R.S. 14:30.1, which mandates a life sentence at hard labor, without benefit of parole, probation, or suspension of sentence. Thus, the Defendant received a significant benefit in the reduction of his sentence exposure as a result of his plea. Considering the trial court's reasons for ruling, the jurisprudence upholding the maximum forty-year sentence, and the benefit the Defendant received as a result of his plea, we find that the trial court did not abuse its discretion in sentencing the Defendant to the maximum possible sentence of forty years.

## CONCLUSION:

The Defendant's sentence is affirmed.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.