MOORE, J.
*1040 The defendant, Michael Anthony Little, Jr., was charged with second degree murder for a homicide he committed when he was 17 years old. On the day of trial, he accepted the state's offer of a guilty plea to the responsive offense of manslaughter. After the court accepted his guilty plea, it sentenced Little to the maximum sentence of 40 years at hard labor with parole eligibility. Little now appeals his sentence as excessive. We affirm.
FACTS
On June 26, 2016, at 3:47 a.m., officers from the Monroe Police Department were dispatched to investigate a "suspicious vehicle" and "shots fired" at the "T" intersection of Short Washington and North 23rd Streets. Arriving at the intersection, they saw broken glass strewn in the middle of the street even with the stop sign. A light-colored, 2007 Chevrolet Equinox sat on the vacant lot adjacent to the intersection, apparently having rolled through the stop sign, and crossing the street into the lot before coming to a stop. Inside the vehicle, police found the body of a black male in the driver's seat with a gunshot wound to his head. There were large amounts of blood in the vehicle and on the victim's clothes. Bloody fingerprints were on the rear passenger door handle, and the front driver's side window was shattered. They found no identification on the victim or state identification in the vehicle.
Subsequently, police obtained fingerprints from the victim, and identified him as Rafael Henry. The autopsy report described two bullet wounds to Henry's head: one bullet entered the right side of his head and exited through his face just under his left eye, but did not immediately kill him; the second, "fatal" bullet entered the left ear and lodged in Henry's spine. Blood loss from both shots would have been lethal. Police found a .45 caliber shell casing on the front passenger seat.
After interviewing several witnesses, investigators developed 17-year-old Michael Little as a suspect in the shooting. They interviewed Little's current girlfriend, Jakeria Hollins, who also happened to be the victim's prior girlfriend. Ms. Hollins admitted that she had met with Henry earlier the night of his murder.
Police obtained Henry's cell phone texts on the night of the murder. Ms. Hollins and Henry had messaged each other on Facebook Messenger. They subsequently met on Spurgeon Drive in Monroe, and smoked marijuana together. Little was working at Sonic when this rendezvous occurred. Ms. Hollins said that Little got home around 1:00 a.m.
Shortly after 3:00 a.m., Ms. Hollins texted Henry asking if he would pick up Little on Spurgeon Drive and take him to North 23rd Street; Henry agreed. He and Ms. Hollins continued to text one another even after Henry picked up Little at the University Manor Apartments on Spurgeon at about 3:25 a.m. When Henry picked up Little, he had a passenger sitting in the front passenger seat, Mark Seaberry. Little got into the back seat of the vehicle. He admitted to police later that he had a .45 caliber handgun on him when he got in the vehicle. Little told police that Henry *1041 dropped Seaberry off around North 18th and Washington Streets near the Lamyville area (a point confirmed by Seaberry). Then he drove back into the Lamyville area and stopped at the stop sign at the intersection of North 23rd and Short Washington. There, Little said, he showed Henry the .45 caliber handgun. Henry took it from him and a struggle ensued over the gun. Little said the gun accidentally went off, striking Henry in the head.[1] The vehicle rolled forward into the vacant lot and stopped. After the gunshot, Little said that Henry was making noises. He became afraid Henry would get him into trouble, so he got out of the vehicle, went to the driver's side window, which had been shattered from the first shot, and shot Henry a second time in the head.[2] Little said that he later disposed of the weapon in a bayou.
The state charged Little with second degree murder. On August 1, 2017, Little appeared for trial. Defense counsel and the state informed the court that a plea agreement had been reached whereby Little would plead guilty to manslaughter, a responsive verdict to second degree murder, with no agreement as to sentencing. The court informed Little that it could impose up to a 40-year sentence for manslaughter with credit for time served. Little said he understood, the court advised him of his rights in accordance with Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed. 2d 274 (1969), and Little waived his rights and pled guilty to manslaughter in violation of La. R.S. 14:31. The court accepted Little's guilty plea and ordered a presentence investigation ("PSI") report.
Before imposing sentence, on October 16, 2017, the court stated that it had considered the PSI and letters submitted on Little's behalf. The court then heard victim impact statements by the victim's mother and brother. Henry's mother, Sherry Thompson, expressed the pain and difficulty she suffered over the loss of her son, and asked the court to impose the maximum sentence for this "senseless murder of my son." The victim's brother, FBI special agent Mario Martin, stated that while he and his brother did not always get along, his murder was completely unnecessary and had significantly impacted his family emotionally and financially. He requested the court to impose the "most severe sentence."
The court reviewed a sentencing memorandum submitted by the state, which recounted the facts, noted the "uncanny mercy" exhibited by the family, and recommended that the court impose the maximum manslaughter sentence.
Lastly, Little spoke on his own behalf, offering his apologies to the family, specifically the victim's mother, and his remorse for "the grief that I caused and the life that was taken." Little's counsel stated that at no time did the defendant "seek to sidestep responsibility in this matter."
After reviewing the facts of the crime and the penalty for manslaughter, the court stated that it had reviewed "both legislative and decisional law" setting special provisions regarding parole consideration for youthful offenders convicted of murder. However, there were no special provisions regarding consideration for parole *1042 eligibility for juveniles receiving long-term sentences of manslaughter. The court observed the violent nature of this crime and stated that the autopsy report and photographs were "hard to look at." Further, the evidence showed Little, a back seat passenger in Henry's vehicle, shot him in the upper right side of his head, the bullet traveled through Henry's brain and out the left side of his face breaking the passenger window, and then Little got out of the car, went around to the driver's side window, and shot Henry again through the left side of his head. The court considered that the autopsy report suggested that the victim was still breathing after the first gunshot, although the court would not comment on whether Henry would have survived the first gunshot. The court characterized the events as looking "very much like an execution which is murder," and opined that on these facts, a jury may likely have convicted Little of murder. For these reasons, the court concluded that Little received "a very substantial reduction" in sentencing exposure, from life term to a maximum of 40 years.
The court considered the sentencing guidelines of La. C. Cr. P. art. 894.1. Due to his age, the court could not conclude that Little was likely to commit another crime, and concluded that a "sentence lighter than the one I'm going to impose would be inconsistent" with the gravity of the offense. The court added that the grade of the criminal violence was "paramount" for this crime committed with a gun possessed by a 17-year-old.
In mitigation, the court considered Little's capacity for caring, noting that he was "dutiful toward" his young son and that in letters others spoke of Little's "humbleness" and "good character traits." The court further stated that Little had no prior felony record, worked and went to school, showing industriousness.
Again noting that the crime bore "the mark of an execution which makes it murder," the court imposed a sentence of 40 years at hard labor. The court stated that it "cannot find peace in imposing any lesser sentence for this offense." The court noted that Little would be eligible for benefits, but because this was a crime of violence, he would have to serve a portion of his sentence before being eligible. Little was given credit for time served.
Little's counsel made an oral motion for reconsideration of sentence, which the trial court denied, commenting that it had "worried over this sentence and spent a lot of time thinking about it."
This appeal followed.
DISCUSSION
On appeal, Little's sole complaint is the excessiveness of the sentence imposed by the trial court. Little asserts that his young age justifies the imposition of a sentence that is mindfully fashioned to avoid cruel and unusual punishment. He further contends that he will possibly spend more time in jail than if he had received life for second degree murder, which allows for the possibility of parole after 25 years, whereas his earliest possible parole release for manslaughter would not come until he serves 28 years. In light of the uncertainty as to his parole eligibility, Little argues that it was incumbent on the court not to punish him more harshly than if he had been convicted of the charged offense. He asks this court to consider that he did not request leniency, but expressed remorse to the family when he spoke on his own behalf and argues that the record shows that he took responsibility for his actions.
Little disputes the district court's view that this was an execution-style murder, and argues that the facts adequately describe *1043 manslaughter. Even the second shot, Little claims, was fired out of fear, and the court erroneously superimposed an unsupported theory in sentencing him. Little also argues that his claim that the two argued over the gun, before he shot Henry, "could well be within the legal definition of manslaughter."
Ultimately, Little argues that the district court should have given greater weight to his youth in individualizing his sentence, and that even with good time and parole eligibility, the penalty imposed is not adequately particularized to him or an appropriately measured response to the offense committed.
The state responds that Little chose to reduce his potential sentencing exposure by accepting a manslaughter plea and received a substantial advantage by means of the plea bargain which afforded him the possibility of parole. The state contends that manslaughter does not adequately describe Little's conduct, as the autopsy report showed that the victim may have had a chance of recovery after the first shot. Considering all the evidence, the state concludes that no abuse of discretion has been shown in the chosen punishment.
La. Const. art. 1, § 20, prohibits cruel, excessive, and unusual punishment. This proscription not only prohibits barbaric punishment but also sentences that are disproportionate to the offense committed. An excessive sentence is one that is grossly disproportionate to the offense committed. State v. Dorthey , 623 So.2d 1276 (La. 1993) ; State v. Bonanno , 384 So.2d 355 (La. 1980) ; State v. White , 48,788 (La. App. 2 Cir. 2/26/14), 136 So.3d 280, writ denied , 14-0603 (La. 10/24/14), 151 So.3d 599. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. White , supra . In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate. State v. White, supra . A court's proportionality analysis should be guided by the gravity of the offense and culpability of the offender. State v. Ross , 50,231 (La. App. 2 Cir. 11/18/15), 182 So.3d 1035 ; State v. White, supra .
A comparison of the punishment imposed with sentences imposed for similar crimes is useful in determining whether a sentence, by its excessive length or severity, is grossly out of proportion to the underlying crime. State v. Fruge , 14-1172 (La. 10/14/15), 179 So.3d 579. Even so, sentences must be individualized to the particular offender and to the particular offense committed. State v. Williams , 51,667 (La. App. 2 Cir. 9/27/17), 245 So.3d 131, writ not cons. , 18-0017 (La. 3/9/18), 237 So.3d 1190. Review of sentences imposed in other cases serves only to set the stage for later inquiry into the nature of the offender and the offense. State v. Lewis , 09-1404 (La. 10/22/10), 48 So.3d 1073.
As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cozzetto , 07-2031 (La. 2/15/08), 974 So.2d 665 ; State v. Hogan , 47,993 (La. App. 2 Cir. 4/10/13), 113 So.3d 1195, writ denied , 13-0977 (La. 11/8/13), 125 So.3d 445. However, in cases where the defendant has pled guilty to an offense which does not adequately describe his conduct, the general rule does not apply and the trial court has great discretion in imposing the maximum sentence for the pled offense. State v. Lewis, supra ;
*1044 State v. Modisette , 50,846 (La. App. 2 Cir. 9/28/16), 207 So.3d 1108. The fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration in a case where the defendant has been convicted of the lesser offense of manslaughter. State v. White, supra .
In State v. Ross , 50,231 (La. App. 2 Cir. 11/18/15), 182 So.3d 1035, 1038, the defendant was indicted for second degree murder for a killing he committed when he was 17 years old, after he and a group of boys left a party, went to the victim's neighborhood, and the defendant shot multiple times through a gate into a crowd of people. The defendant pled guilty to manslaughter and the trial court imposed the maximum 40-year sentence. This court affirmed that sentence, noting that the defendant's young age and lack of a criminal record were factors to be considered in sentencing, but were outweighed by the severe danger created by his actions and the substantial leniency he received by pleading guilty to manslaughter.
In State v. White , supra , a 19-year-old first offender was charged with second degree murder but convicted of manslaughter and sentenced to the maximum of 40 years at hard labor. The victim fought with the defendant and two others twice, and walked away, but then the defendant reappeared with a gun and shot the unarmed victim at close range. This court concluded that the evidence supported a verdict of second degree murder, the defendant benefited greatly from the lesser verdict of manslaughter, and the sentence was neither disproportionate to the severity of the young man's offense nor shocking to the sense of justice.
In State v. Harris , 11-626 (La. App. 5 Cir. 11/27/12), 105 So.3d 914, an 18-year-old first offender, who accepted responsibility for his actions, was charged with two counts of second degree murder but convicted of manslaughter and negligent homicide and received the maximum sentences of 40 years at hard labor for manslaughter and five years at hard labor for negligent homicide, to run consecutively. In State v. Lanieu , 98-1260 (La. App. 1 Cir. 4/1/99), 734 So.2d 89, writ denied , 99-1259 (La. 10/8/99), 750 So.2d 962, a 19-year-old first offender charged with second degree murder and convicted of manslaughter received the maximum 40-year sentence. Both sentences were upheld.
In light of the facts of this offense, the district court properly concluded that a jury would have likely found that Little's conduct constituted second degree murder. Little claims that the second shot he fired into Henry's head, at point-blank range, constituted manslaughter because he fired it out of fear, specifically, fear that Henry might tell on him or get him in trouble. However, this still fits the crime of second degree murder. Simply put, Little intended to silence Henry forever. Manslaughter requires a showing of "sudden passion or heat of blood caused by provocation sufficient to deprive an average person of self-control" to negate the specific intent requirement for murder. La. R.S. 14:31. Since Little claims the first shot was accidental, it is hard to argue that the second shot arose out of heat of blood. Alternatively, fear that constitutes a justified killing must be fear that arises from a physical threat of death or great bodily harm. La. R.S. 14:18(6). Aiming and firing the .45 into Henry's head at point-blank range demonstrates a specific intent to kill the unarmed and already severely wounded Henry in order to ensure his silence. Hence we find no error in the trial court's characterization of this offense as an execution-style murder.
Finally, we find no merit in the argument that Little received a sentence more severe than a sentence for second degree *1045 murder. The guilty plea to manslaughter gave Little two very significant advantages over a conviction for second degree murder: instead of a life sentence, he received a less-than-life sentence of 40 years; and instead of the mere possibility of being parole eligible after serving 25 years of a life sentence for a second degree murder conviction, La. R.S. 15:574.4 G, under the manslaughter conviction, he will be eligible for parole at age 45 after having served 28 years, according to the defense calculation. La. R.S. 15:574.4 A(2). The state maintains Little will be parole eligible after 24 years with good time. Most importantly, however, is that in the case of second degree murder, eligibility for parole consideration is only a possibility for which one must wait 25 years to determine. By contrast, in the second case, consideration for parole is a certainty.
Considering the nature of the shooting, which could appropriately be characterized as "execution-style," and the benefit Little received as the result of his plea agreement, the manslaughter maximum sentence does not shock the sense of justice and is not grossly disproportionate to the severity of this offense, even for this young offender. We find no abuse of discretion by the sentencing court.
We have also reviewed the entire record and find nothing we consider to be error patent. La. C. Cr. P. art. 920 (2).
CONCLUSION
For the foregoing reasons, Little's conviction and sentence are affirmed.
AFFIRMED.

According to the state's account of Little's statement made while his parents were present, Little said that he shot Henry as he pulled the gun away from him.

The autopsy listed the cause of death as "two gunshot wounds," although the pathologist concluded that Henry was still alive after the first shot because his heart was still beating and he was still breathing. The state maintained that even if the first shot was accidental, the second shot showed a specific intent to kill.