STATE OF LOUISIANA

VERSUS

RYK FRICKEY

NO. 22-KA-261

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 20,168, DIVISION "C"
HONORABLE CONNIE M. AUCOIN, JUDGE PRESIDING

March 01, 2023

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and John J. Molaison, Jr.

<u>**CONVICTION AND SENTENCE AFFIRMED**</u>
**SMC**
**JGG**
**JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Joel T. Chaisson, II
      Louis G. Authement

COUNSEL FOR DEFENDANT/APPELLANT,
RYK FRICKEY
      Autumn A. Town
      Graham L. Bosworth

**CHEHARDY, C.J.**

Defendant, Ryk Frickey, appeals his conviction and sentence for one count of aggravated criminal damage to property. Having reviewed the appellate record, the briefs submitted by the parties, and the applicable law, we find no merit to the arguments raised by defendant. Accordingly, for the following reasons, we affirm defendant's conviction and sentence.

**PROCEDURAL HISTORY**

On June 17, 2020, the St. Charles Parish District Attorney filed a bill of information charging defendant, Ryk Frickey, with one count of aggravated criminal damage to property in violation of La. R.S. 14:55. That same date, defendant was arraigned and pled not guilty. Later, the State amended the count to include a firearm enhancement charge on the basis that a firearm was discharged into the front door of a residence located at 201 Evelyn Drive in Luling, Louisiana. On October 1, 2020, the State filed a motion to invoke firearm sentencing provision.[1] On November 10, 2020, defendant pled not guilty to the amended bill.

Various motions, notices, and responses were filed.[2] In particular, the State filed a motion in *limine* and a notice of disclosure, both relating to Deputy Jeffery Winn, which defendant opposed.[3] On April 6, 2021, Joseph McMahon orally moved to enroll as counsel, which request the district court denied. That same date, as to the State's motion in *limine* regarding Deputy Winn, the district court

---

[1] La. C.Cr.P. art. 893.3 provides for sentences for felonies and specifically enumerated misdemeanors when the finder of fact finds beyond a reasonable doubt that an offender possesses a firearm (Paragraph A), uses a firearm (Paragraph B), discharges a firearm (Paragraph C), or uses or discharges a firearm and causes bodily injury (Paragraph D) during the commission of the crime. The article also provides sentences for specifically enumerated violent felonies when an offender commits the violent felony with a firearm or discharges a firearm during the commission of the violent felony (Paragraph E). To trigger the terms under Article 893.3, the State must comply with La. C.Cr.P. art. 893.1, entitled "Motion to invoke firearm sentencing provision."

[2] On April 9, 2021, Fenwick Swann, on behalf of the "29th Judicial District Public Defender Office," filed a rule to traverse defendant's right to appointment of an indigent defender. The pleading was addressed at a hearing on April 13, 2021, and the judge reserved the right for the public defender's office" to file a motion to recoup attorney's fees until the end of trial.

[3] Throughout the record, the deputy's name is spelled "Winn" and "Wynn." For consistency, "Winn" will be used in this opinion.

stated it would "hold open specific rulings as it arises in the trial" and ruled there would be no mention in opening statements or *voir dire* about Deputy Winn's termination. Thereafter, the State filed a notice of intent to introduce evidence pursuant to La. C.E. art. 404(B). Following a contradictory hearing, the district court ruled the evidence was admissible.

Trial commenced on April 20, 2021. Following a three-day trial, a six-person jury unanimously found defendant guilty as charged. That same day, the district court ordered a presentence investigation ("PSI").

On July 2, 2021, with new counsel enrolled, defendant filed a motion for new trial. On July 14, 2021, defense counsel filed a motion to appoint sanity commission to determine defendant's competency to proceed and a motion to continue the sentencing hearing. The following day, the district court issued an order staying the proceedings in light of defense counsel raising the issue of defendant's competency. The State filed memoranda opposing defendant's motions for new trial, to appoint a sanity commission, and to defense counsel's motion to continue the sentencing hearing.

The district court held a hearing on July 20, 2021, and denied the motion to appoint a sanity commission. At that same hearing, defendant requested that he be allowed to review the PSI report, or be told the gist of its content, if the report contained confidential information. The district court denied the request and placed the PSI under seal. The court also heard arguments regarding the motion for new trial, which it then denied. Defense counsel objected to the ruling and expressly waived sentencing delays. The district court then sentenced defendant to ten years imprisonment at hard labor with the Department of Corrections.[4] On July

---

[4] The record indicates that the district court restricted probation. While La. C.Cr.P. art. 893.3 makes no mention of probation requirements as it applies to La. C.Cr.P. art. 893.3(C), because the ten-year sentence is a mandatory minimum, the trial court was precluded from considering probation. *See State v. Rogers*, 07-427 (La. App. 3 Cir. 10/31/07), 969 So.2d 707, 710 n.2.

27, 2021, defendant filed a motion to reconsider sentence, which the district court denied, with written reasons.

The instant appeal ensued.

On appeal, defendant presents eight issues for review. Specifically, he argues that the evidence was insufficient to support the jury verdict, that he was denied his due process right to the counsel of his choice, and that the court erred in denying his request to introduce evidence of Deputy Winn's prior behavior. Defendant further asserts the district court erred in failing to appoint a "competency commission," in refusing to provide him the PSI, and in admitting 404(B) evidence. Lastly, defendant avers that his sentence is excessive and requests an errors patent review.

**FACTUAL BACKGROUND**

### *Testimony of Brandon Breaux*

Brandon Breaux, the victim in this case, testified at trial that defendant is his first cousin and they grew up together, living two houses apart, in Des Allemands near Twin Bridge Road. Approximately eleven years ago, the victim moved to 201 Evelyn Drive. He testified that things went "south" between him and defendant in 2011 or 2012, and that there has been trouble between them ever since. He admitted that in 2013, he testified before a federal judge that he has held a grudge against defendant for approximately the last five years.

The victim testified that he has "50/50 custody" of his children and that his daughters, who were eleven and nineteen years old at the time of trial, stay with him on Mondays, Wednesdays, and every other Friday, Saturday, and Sunday. On the date of the incident at issue, the victim's girlfriend, Jessica St. Amant, lived with him, as did her son on a split schedule.

The victim testified that on May 1, 2020, he arrived home at approximately 7:00 p.m. following a day spent fishing. Ms. St. Amant was home with him, but

his children were staying with his mother. At approximately 10:45 p.m., after using the restroom, the victim thought he heard a vehicle stop. Realizing he had not locked his vehicle, he approached the French doors in his home, turned on the exterior lights, and peered out of the window, but he did not see anyone in his driveway or his neighbor's driveway. At the same time, his dogs also approached the French doors to be let out.

The victim testified that he exited the house with the dogs and proceeded towards his vehicle parked in the driveway to lock it before going to bed. While one dog continued into the yard, the other dog stopped and "just stood there," refusing to move. When the victim looked to see what had the dog's attention, he saw defendant "above the white vinyl fence in the back of the house," standing in the bed of a white Chevrolet pickup truck holding a long-barreled gun pointed towards the back of his house. The victim described the fence as approximately six feet tall. According to the victim, defendant did not speak and "was just more like a statue, just froze in that position while looking down the barrel of the gun." Later, the victim identified defendant's truck in photographs.

The victim described defendant as wearing a white t-shirt and recalls that a streetlight was on. He explained that he knew it was defendant because he had known defendant his entire life and that defendant has "pretty distinct facial features." The victim stated that, in a panic, he went to his vehicle where he had a firearm, but realized that if he opened the door, the vehicle lights would turn on. Through the vehicle window, the victim saw that defendant had not moved. Crouching behind his vehicle, the victim called 9-1-1.[5]

---

[5]    Amanda Pertuis, a dispatcher with the St. Charles Parish Sheriff's Office, testified regarding the maintenance of 9-1-1 records. She indicated that one 9-1-1 call was recorded in relation to this incident and a CAD report was generated. That call was admitted as State's Exhibit 6 and was played for the jury. The call substantially corroborates the victim's testimony at trial.

After placing the 9-1-1 call, the victim retreated into his home, called the dogs inside, and locked the door. He alerted Ms. St. Amant, who was sleeping on the couch, that someone was outside pointing a gun at the house and instructed her to go to an interior room. He stated that as Ms. St. Amant crossed the threshold of the bathroom, "a shot was fired" through the door. While still speaking with 9-1-1, a single shot into the home could be heard. During the 9-1-1 call—which pursuant to a pretrial stipulation was played for the jury—the victim told the operator that he had previously told others that defendant threatened to kill him.

Once law enforcement arrived on the scene, the victim opened the door. He explained that he saw glass everywhere and "holes in the wall where the shotgun pellets had entered the wall." There were also holes in the laundry room wall and into the refrigerator located in the laundry room. The victim testified that at the end of the hallway, he saw what he believed to be the wad from the shotgun shell. He picked it up and gave it to a deputy.[6] The victim described tire marks in the drainage ditch where defendant's truck was parked, which he did not remember seeing earlier in the day.

In addition to the physical damage to his property, the victim testified that the incident "had a great deal of negative effect" on his life, that he feels constantly threatened, and that it has negatively affected his relationships. He explained that his girlfriend no longer felt comfortable in his home and purchased her own residence. The victim stated that the mother of his children also no longer felt comfortable with his children being in the home because she felt "there was no safety net or nothing to stop it from happening again."

---

[6] Deputy Jeffrey Winn testified that while speaking to the victim, the victim picked up a piece of "wadding," which he explained was a piece of the shotgun shell that comes out when the round is fired, from the floor inside the house and handed it to the deputy. The deputy did not know exactly where it was found, and he gave it to crime scene technician Jason Troxler once he arrived on the scene.

### Testimony of Jessica St. Amant

Ms. St. Amant testified that on May 1, 2020,[7] she and her son lived with the victim at 201 Evelyn Drive, and that the victim's children lived with them about fifty percent of the time. She stated that around 10:45 p.m., she was sleeping on the sofa in front of the French doors with her head on the side closer to the doors. She awoke to the victim entering the house in a panic. He told her to get off the sofa because defendant was outside with a gun. She got off the couch, proceeded down the hallway, and as she "rounded into the bathroom, there was a gunshot." The victim was close behind her because he went to lock the door. She described hearing the glass in the door breaking and getting into the bathtub with the two dogs. The victim was also in the bathroom, and stayed on the phone with 9-1-1. She could still hear glass dropping and did not know if anyone was in the house.

Ms. St. Amant testified that she did not see the shooter, nor did she hear a verbal altercation or fighting outside before the victim woke her up. She recalled that when she exited the bathroom, she saw "a huge hole in the door" and glass everywhere. She indicated that there were bullet holes in the wall behind the sofa, through the living room, and into the fridge in the laundry room.

### Testimony of Deputy Jeffery Winn

On May 1, 2020, Deputy Jeffrey Winn was working in the patrol section of the St. Charles Parish Sheriff's Office. At 10:50 p.m., while on routine patrol, he responded to a call regarding shots fired at 201 Evelyn Drive in Luling. Deputy Winn understood that at that time, other deputies were pursuing a white pickup truck that was possibly involved. He elected to go to the residence to check on the people there and the crime scene. Upon arrival, he met and interviewed the victim

---

[7] At the time of trial, Ms. St. Amant was no longer residing with the victim.

and Ms. St. Amant, whose recitation of the events were consistent with each other. He described the victim as extremely upset, fearful, and nervous.

Upon inspecting the residence, Deputy Winn observed French doors with broken glass and wood, and "strike marks," or punctures, in the drywall consistent with gunfire. Deputy Winn, Sergeant Jorge Acevedo, and Deputy Chase Anderson examined the curtilage of the residence and observed a spent shotgun shell casing and a live shotgun shell that had been ejected without being fired. Deputy Winn stated that a crime scene technician was summoned to the scene.

Deputy Winn identified several photographs taken during the processing of the scene, which captured: (1) the physical damage to the inside of the residence from the shotgun pellets, including the French doors with broken glass and wood molding, "strike marks" in the drywall near the front door, and the utility room through which the projectile traveled; (2) an unfired shotgun shell casing and a fired shotgun shell casing recovered from the crime scene; and (3) the victim's vehicle and track marks from a vehicle parked in the front of the residence.[8]

Deputy Winn did not have contact with defendant. He authored a report and was not further involved with this case. He denied knowing the victim or Ms. St. Amant prior to the investigation. Deputy Winn did not collect any firearms from the victim while he was at the residence, and he did not canvas the neighborhood or speak to anyone else. He testified that the location where defendant was apprehended was only a short distance from the victim's residence.

### Testimony of Corporal Justin Hebert and Deputy Jonathan Russell

Corporal Hebert testified that on May 1, 2020, he was working with the patrol division of the St. Charles Parish Sheriff's Office. At approximately 10:50 p.m., while on patrol in Luling on Davis Drive, located one street over from

---

[8] Deputy Winn acknowledged that he did not direct anyone to do a comparison between those tire marks and any other tire marks that may have been collected by the crime scene technician.

Evelyn Drive, he crossed the train tracks, and as he approached the intersection of Evelyn and Davis, he saw a subject in a white shirt standing by or walking towards a truck. Corporal Hebert stated that he heard the 9-1-1 call, and explained that, "Our system on our computers, when a call is about to be dispatched, it notifies us." According to Corporal Hebert, he read the comments on his computer, which reflected that the 9-1-1 caller advised that defendant was standing outside his residence with a gun. Corporal Hebert asked the dispatch if there was "something on Evelyn Drive." Just as he was informed by dispatch that they were about to issue the call out, Corporal Hebert testified that he heard a gunshot from his patrol position and immediately turned his vehicle around to respond. He explained that based on his sixteen years in law enforcement, he was certain it was a gunshot.[9]

According to Corporal Hebert, as he approached the intersection of Davis and Evelyn, he observed a white pickup truck cross through Evelyn Drive and speed through the intersection without stopping at the stop sign. Corporal Hebert identified the white pickup truck as belonging to defendant based on his prior dealings with defendant in the same truck. He followed defendant while waiting for another officer to arrive to affect a traffic stop. When Deputy Jonathan Russel alerted Corporal Hebert that he was approaching, Corporal Hebert activated his lights and siren. When defendant did not stop, Deputy Russel blocked the road, and defendant pulled into a church parking lot.[10] Deputy Russel and Corporal Hebert initiated a felony traffic stop with their guns drawn and commanded the

---

[9]    Deputy Jonathan Russel with the patrol division of the St. Charles Parish Sheriff's Office testified at trial that at 10:50 p.m. on May 1, 2020, he was called to assist regarding an incident at 201 Evelyn Drive. He indicated that prior to the call going out, Corporal Hebert asked about a call for service. Deputy Russel provided that Corporal Hebert said he heard a gunshot.

[10]    Deputy Russel testified similarly. He stated that as he was en route to the scene, Corporal Hebert advised that he was traveling behind a vehicle fleeing the area. He provided that Corporal Hebert believed defendant, who was identified in the 9-1-1 call, was in the vehicle. Deputy Russel proceeded towards Corporal Hebert and could see the patrol cruiser's lights behind the vehicle. He stated that Corporal Hebert relayed that the truck was not stopping. Deputy Russel then positioned his patrol vehicle to block both lanes of traffic to direct the truck into a church parking lot.

driver to exit the vehicle with his hands in the air. After approximately two minutes, the driver stepped out of the vehicle and was ordered to step to the back of his vehicle. The driver complied with orders to kneel, and Deputy Russel handcuffed and apprehended him.

Deputy Russel patted the driver down and based on a Louisiana identification card, confirmed defendant as the driver. Corporal Hebert described defendant's demeanor at that time as very calm. He explained that defendant did not seem upset or angry, but devoid of emotion. Deputy Russel similarly described defendant as "very, very void of any kind of emotion." Deputy Russel acknowledged that defendant was not belligerent nor did he appear intoxicated.

Corporal Hebert and Deputy Russel both testified that they saw a shotgun in plain view on the passenger seat of defendant's pickup truck, and a rifle, which Deputy Russel described as modified, in the bed of the truck. Deputy Russel transported defendant to the correctional facility, after which his involvement in the investigation ended. A crime scene technician arrived at the scene, and the truck was towed pending a search warrant. After defendant and the truck were relocated, Corporal Hebert proceeded to the crime scene at 201 Evelyn Drive, which he described as approximately one mile from the parking lot where defendant was apprehended.

Once there, Corporal Hebert was briefed by Deputy Winn. He observed shattered glass and bullet holes through the door and in the living room wall, and bullet holes that went through a wall and into a refrigerator in the utility room. Crime scene technicians photographed and collected shells. Corporal Hebert testified that he observed tire marks in the grass near the residence's fence line near the road, which was consistent with where he saw the white truck parked.

***Testimony of Jason Troxler***

Mr. Troxler, a crime scene technician with the St. Charles Parish Sheriff's Office, was called to 201 Evelyn Drive, at approximately 11:00 p.m. on May 1, 2020. Mr. Troxler testified that this case involved three locations: 201 Evelyn Drive, 422 Barton Avenue, and the sheriff's office headquarters. He went to the location on Barton Avenue after midnight on May 2, 2020, and to the scene at headquarters the afternoon of May 3, 2020.

Mr. Troxler described the scene on Evelyn Drive as dark with some street lights, and stated that Deputy Winn, Lieutenant Devin Lavergne, Sergeant Acevedo, the victim, and Ms. St. Amant were present. He described the victim's demeanor as scared. After having been briefed by Deputy Winn, Mr. Troxler took photographs. He was advised that the side door to the residence had been shot with what appeared to be a shotgun and that there were some casings located on the ground in the driveway. Deputy Winn handed Mr. Troxler a shotgun wad that the victim had given him, which Mr. Troxler secured inside of his unit.

At trial, Mr. Troxler identified and discussed photographs he had taken of the crime scene on Evelyn Drive. He was directed to the west side of the property where he photographed and documented tire tracks in the grass.[11] He also observed and photographed two shotgun shell casings that were located in the driveway. He testified that the first, a red 12 gauge shotgun shell, was not fired, but that the second, "gray or greenish shotgun shell," was fired. He explained that fingerprint testing was not performed on the casings due to the rough surface of each shell.

Mr. Troxler further identified photographs from the residence of a double glass door that was shattered and the wood framing that was damaged, as well as

---

[11] Mr. Troxler explained that there was no impression or identifying marks left in the mud or sand from which he could obtain a casting.

photographs of the holes in the wall from the shot and of the laundry room showing damage to the inside wall and to the refrigerator. Mr. Troxler testified that he used trajectory rods to ascertain that the projectile traveled through the wall from the direction of the damaged door. There was shattered glass and wood fragments along the wall separating the living room from the laundry room. He stated that a projectile was recovered in the laundry room.

Next, Mr. Troxler testified regarding the location on Barton Avenue. There were several patrol deputies there when he arrived, and he was assigned to photograph a white Chevy pickup truck. He did not search the inside of the vehicle but only photographed its exterior. In the bed of the truck, he saw a .22 rifle "standing up on the barrel with the stock sticking up." Mr. Troxler removed the rifle before the truck was towed to headquarters.

The truck was later searched pursuant to a search warrant. Mr. Troxler photographed the vehicle before removing any evidence. He identified a shotgun laying on the passenger seat, and shotgun shells on the passenger side floor board. He saw two 12-gauge shotgun shells behind the driver's seat and a .22 caliber rifle behind the passenger's seat. When Mr. Troxler removed the shotgun from the passenger seat, he noticed a shell that appeared to be jammed between the chamber and the loading port. It took him several forceful attempts to remove the shell. Mr. Troxler stated that the rifle and .22 caliber gun both had bullets in the magazines, but he could not recall whether either contained a bullet in its chamber.

### Testimony of Emily Terrebonne

Ms. Terrebonne, a firearm examiner with the Jefferson Parish Sheriff's Office, was assigned to perform a firearm identification in this case. She prepared a report outlining the results of her testing on the shotgun recovered from defendant's truck. She test-fired the shotgun, and compared the test-fired shell to the recovered fired shotgun shell. Ms. Terrebonne explained that the two shells

had the same general class characteristics, but there was not enough to conclude that defendant's shotgun fired the particular shot shell. She testified that this result was not unexpected. She examined the wad and stated that it was consistent with a 12-gauge plastic shot shell wad and was consistent with a lead buckshot.

**DISCUSSION**

*Assignment of Error No. 1 – Sufficiency of the Evidence*

In his first assignment of error, defendant contends he was denied his right to due process of law guaranteed under Article I, Section 2 of the Louisiana Constitution of 1974 and the Fifth and Fourteenth Amendments to the United States Constitution, because the evidence was insufficient to support the guilty verdict of aggravated criminal damage to property. Specifically, defendant contends the State failed to meet its burden of proving that he was the shooter. He challenges the identification of the shooter and challenges the victim's credibility and motive for identifying defendant as the shooter. Defendant further avers the shotgun in his truck was not matched by ballistic evidence to the gun fired at Mr. Breaux's house, and that his gun was jammed. For these reasons, defendant concludes the evidence was insufficient to support the jury's guilty verdict.

In response, the State argues that it proved all of the elements of the offense of aggravated criminal damage to property. The State asserts that there was no evidence or testimony to support the guilt of anyone other than defendant, and that the trial judge expressly found that the identification of defendant as the shooter was not questioned.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307

So.3d 1189, 1195, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021).  This directive requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing.  *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702.  This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence.  *State v. Hayman*, 20-323 (La. App. 5 Cir. 4/28/21), 347 So.3d 1030, 1040.  Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury.  *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804.  As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt.  *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 477.

In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the perpetrator's identity.  When the key issue is identification, the State must negate any reasonable probability of misidentification in order to carry its burden of proof.  *State v. Walker*, 10-536 (La. App. 5 Cir. 5/10/11), 66 So.3d 486, 491, *writ denied*, 11-1103 (La. 11/23/11), 76 So.3d 1149.  A positive identification by only one witness is sufficient to support a conviction.  *State v. Harrell*, 19-371 (La. App. 5 Cir. 7/8/20), 299 So.3d 1274, 1281.

Evidence may be either direct or circumstantial.  Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience.  *State v.*

*Lloyd*, 21-645 (La. App. 5 Cir. 8/24/22), 348 So.3d 222, 231, *writ denied*, 22-1354 (La. 11/22/22). The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id*. (citing La. R.S. 15:438). This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt. *State v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 539, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 382, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123. Absent internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Washington*, 16-732 (La. App. 5 Cir. 4/12/17), 219 So.3d 1221, 1226. It is not this Court's function to assess the witnesses' credibility or re-weigh the evidence. *State v. Lane*, 20-137 (La. App. 5 Cir. 12/23/20), 309 So.3d 886, 906, *writ denied*, 21-100 (La. 4/27/21), 314 So.3d 836.

Here, defendant was convicted of aggravated criminal damage to property. Aggravated criminal damage to property is the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion. La. R.S. 14:55. A conviction for aggravated criminal damage to property does not require a showing of specific intent. Instead, the State must only show general intent; that is, that the defendant "voluntarily did the act." *Lane*, 309 So.3d at 904.

In the instant case, defendant does not challenge the essential statutory elements of the offense; he challenges the identification and the evidence that he was the perpetrator of the offense.[12]

The victim testified as to his family relationship and life-long familiarity with defendant. He testified that on the night of the incident, he saw defendant above the fence and that defendant was standing in the bed of a white Chevrolet pickup truck. The victim provided that defendant wore a white t-shirt and that a streetlight was illuminated. He explained that he knew it was defendant because he has known defendant his entire life and defendant has distinct facial features.

Additionally, Corporal Hebert saw a subject in a white shirt standing by or walking towards a truck. He testified that immediately after the shooting, he observed a white pickup truck cross through Evelyn Drive. Corporal Hebert identified the vehicle as belonging to defendant based on prior dealings with him. When defendant was stopped, Corporal Hebert and Deputy Russel observed a shotgun in plain view across the passenger seat of defendant's truck. Evidence established that a shotgun was fired into the residence. Corporal Hebert saw defendant, with whom he was familiar, in the same colored shirt that the victim described the shooter as wearing. Further, Corporal Hebert and the victim both saw defendant in a white pickup truck.

Ms. Terrebonne test-fired the shotgun found in the truck and the test-fired shell was compared to the recovered fired shotgun shell. Although Ms. Terrebonne testified that there was not enough evidence to conclude that the

---

[12]    Because defendant does not raise any arguments relating to the sufficiency of the evidence with respect to the statutory elements, we need not address the evidence as it relates to each essential element. *See State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500 n.12, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. Nevertheless, the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of aggravated criminal damage to property, including evidence that defendant had the intent to fire a gun into a residence that was foreseeably occupied in light of the time of night, the COVID-19 pandemic, and the cars parked in the victim's driveway. Further, the State established that the shotgun fired into the home damaged a door, walls, and a refrigerator.

shotgun fired the particular shot shell, she did not exclude the recovered shotgun as the weapon that fired the shell found in the victim's residence.

The jury heard all of the testimony and viewed all of the evidence in this matter and found the evidence to be credible. This Court will not second guess credibility determinations. *See Chinchilla*, *supra*. Accordingly, considering the law and the evidence admitted at trial, we conclude that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient to find that defendant committed the offense under the standard set forth in *Jackson* to support defendant's conviction. This assignment lacks merit.

### *Assignment of Error No. 2 – Right to Counsel of his Choice*

In his second assignment of error, defendant argues that he was denied his right to due process of law guaranteed under Article I, § 2 of the Louisiana Constitution of 1974, and the Fifth and Fourteenth Amendments to the United States Constitution, when the district court denied Joseph McMahon's motion to enroll as counsel of record prior to trial, thereby denying defendant the ability to proceed to trial with the attorney of his choice. We disagree.

Defendant argues that in denying his request for new counsel, the district court committed plain error not subject to a harmless error analysis. Specifically, defendant contends that because the record reflects that Mr. McMahon did not request a continuance of the scheduled trial, and in light of the fact that Mr. McMahon had nearly three weeks to prepare for trial, had met with defendant, and had been paid, the district court abused its discretion in denying Mr. McMahon's motion to enroll. Defendant avers that a new trial must be granted.

In response, the State argues the district court's decision was based on legitimate grounds. In particular, the State contends the trial occurred under the strenuous precautions mandated during the pandemic, which would have made a

continuance more disruptive. Additionally, the State argues that defendant had eleven months to hire his own attorney, but waited until two weeks before the trial commenced to attempt to do so. The State also contends that the district court found that defendant lacked the financial means to retain his own attorney.

The record shows that at a hearing held on April 6, 2021—two weeks prior to the scheduled April 20, 2021 trial date—Mr. McMahon appeared and orally motioned to enroll as counsel for defendant. Mr. McMahon represented that he would supplement the record with a written motion.[13] When asked by the district court when he was contacted by defendant, Mr. McMahon explained that they met "on at least two occasions" and that defendant came to his office on approximately March 30, 2020, to formally retain him. The State expressed that it did not object to Mr. McMahon enrolling or to defendant having the counsel of his choice, but requested that Mr. McMahon's "enrollment be contingent upon the fact that he can assert to this court that he will be ready to try the case on the 20th."

Thereafter, the district court denied Mr. McMahon's motion, stating:

> While Mr. Frickey does have the right to an attorney of his choosing, the Supreme Court as well as the 5th Circuit in *State vs. Anthony*, *State vs. Leggette*, as well as *State vs. Divine* out of the Fifth Circuit have enunciated that that right and that choice must be exercised in a reasonable amount of time.
>
> This case has been pending since May of 2020. Mr. Frickey has appeared in this court on this case 11 times since May of 2020. The jury trial date in this matter was selected on January 19th of 2021, well over three months ago. Mr. Frickey has had more than a reasonable amount of time.
>
> In the Fifth Circuit case, *State vs Divine*, the defendant in that matter only had two months to retain a counsel of his choosing and failed to do so and the Fifth Circuit in that case determined that that was more than enough time for him to obtain a counsel of his choosing.

---

[13] No written motion is included in the record.

> I will not allow Mr. Frickey to disrupt the process that is in place and to further stall or delay proceeding with this jury trial that is going in two weeks, 14 days from today.
>
> As such, the court is going to deny the Motion to Enroll at this time and we will proceed with the hearing on the other matters that are scheduled for today.[14]

Subsequently, on April 9, 2021, the 29th Judicial District Public Defender's Office filed a rule to traverse defendant's right to appointment of an indigent defender on the basis that defendant had posted bond and retained private counsel. At a pre-trial hearing on April 13, 2021, the rule to traverse was addressed. There, the public defender argued that, on the record, Mr. McMahon was questioned in reference to the timing of his contact and involvement with defendant, but that at no point on the record was he questioned about his ability to keep the trial date, or his intention to seek a continuance. Thus, based on defendant's ability to retain an attorney and post bond, he was not in need of a public defender.

Defendant was then traversed and testified about his employment and finances. Despite defendant's testimony that he had talked to Mr. McMahon three weeks prior, that he had paid Mr. McMahon $3,000.00 to represent him, and that Mr. McMahon was the attorney of his choice, the district court concluded that defendant was "indigent," stating "$3,000 is hardly going to pay a private attorney to try a jury trial in this matter." Further, the district court noted that had it granted Mr. McMahon's oral motion to enroll two weeks prior to the scheduled trial, it would have had to consider a motion to continue, or defendant might have grounds for asserting an ineffective assistance of counsel claim. The district court, in exercising its discretion, concluded that granting the motion two weeks prior to trial would have constituted an unnecessary delay. In short, the record shows that the district court's decision to deny Mr. McMahon's oral motion to enroll was based on the facts that (1) when his indigent status was challenged, defendant's

---

[14] Mr. McMahon objected to the ruling.

testimony failed to prove that he could afford to retain his own counsel for the duration of trial; and (2) granting the motion likely would result in a continuance and, thus, constitute an unnecessary delay in the trial. *See State v. Divine*, 98-812 (La. App. 5 Cir. 5/19/99), 738 So.2d 614, 616-17, *writ denied*, 99-2393 (La. 2/4/00), 754 So.2d 222, *cert. denied*, 530 U.S. 1219, 120 S.Ct. 2227, 147 L.Ed.2d 258 (2000).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." *State v. Woods*, 09-399 (La. App. 5 Cir. 3/9/10), 38 So.3d 391, 410, *writ denied*, 10-784 (La. 10/29/10), 48 So.3d 1096. The Louisiana Supreme Court has found that it is both structural error requiring reversal, and a violation of the Sixth Amendment, when a criminal defendant has been denied his right to retained counsel of choice. *State v. Wilson*, 09-108 (La. App. 5 Cir. 12/29/09), 30 So.3d 149, 153. When the right to be assisted by counsel of choice is wrongly denied, no harmless error analysis is required regarding counsel's effectiveness or prejudice to the defendant. *State v. Ventris*, 10-889 (La. App. 5 Cir. 11/15/11), 79 So.3d 1108, 1119. The Louisiana Supreme Court stated:

> Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness— with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

*State v. Reeves*, 06-2419 (La. 5/5/09), 11 So.3d 1031, 1056 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 2563, 165 L.Ed.2d 409 (2006)).

The Louisiana Constitution ensures similar rights to the assistance of counsel for a criminal defendant as those arising under the federal constitution.

*Ventris*, 79 So.3d at 1119. Generally, a person accused in a criminal trial has the right to counsel of his choice. *Id.* A defendant is guaranteed the right to counsel of choice so long as the defendant can obtain and afford the services of said counsel. *State v. Sims*, 07-2216 (La. 11/16/07), 968 So.2d 721, 722. The right is not absolute. *Ventris*, 79 So.3d at 1119. While an indigent defendant has the right to a lawyer, he does not have the right to a particular attorney. *State v. Bond*, 94-509 (La. App. 5 Cir. 1/31/95), 650 So.2d 354, 358. This is especially true absent a showing that the court-appointed counsel is incompetent, unprepared, or burdened with a conflict of interest. *Id.*

The Louisiana Supreme Court "has consistently held that this right cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice." *State v. Major*, 22-387 (La. 3/9/22), 333 So.3d 1231, 1232. A defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings. *State v. Seiss*, 428 So.2d 444, 447 (La. 1983). A defendant in a criminal trial cannot force a postponement by a last minute change of counsel. *Ventris*, 79 So.3d at 1121. A district court's ruling on whether a defendant has exercised his right to choose an attorney at a reasonable time and in a reasonable manner "will not be disturbed absent a clear showing of abuse of discretion." *Id.* at 1119.

In the instant case, we find no abuse of discretion by the trial judge in denying Mr. McMahon's oral motion to enroll as defendant's "counsel of choice." The record shows that Mr. McMahon attempted to enroll two weeks prior to the scheduled jury trial, even though defendant had approximately ten months to retain private counsel.[15] The record also shows that defendant's jury trial had been set

---

[15]     *See Divine*, *supra* (the defendant had approximately two months to retain counsel); *State v. Leggett*, 363 So.2d 434 (La. 1978) (the defendant had from approximately early September to late November to retain counsel); *Williams*, *supra* (the defendant had three months to retain counsel).

for nearly four months before he retained Mr. McMahon. Moreover, defendant does not assign as error any deficiencies attributable to his appointed counsel, who had already filed several pre-trial motions on defendant's behalf and was ready to proceed to trial. Lastly, the record indicates that defendant most likely would not have been able to afford to retain Mr. McMahon for the duration of the proceedings. Thus, we find defendant has failed to show any prejudice as a result of the district court's ruling. Additionally, we find the record does not reflect that the trial judge abused his discretion in denying Mr. McMahon's request to represent defendant. *See Abdul*, 94 So.3d at 815. Consequently, this assignment of error lacks merit.

### *Assignment of Error No. 3 – Failure to Allow Evidence of Deputy Winn's Prior Alleged Acts of Unethical and Dishonest Behavior*

On March 24, 2021, the State filed a motion *in limine* seeking to exclude at trial any information regarding Deputy Winn provided in the State's notice of disclosure. The State represented that it did not intend to call Deputy Winn as a witness at trial. In support of its motion, the State argued that the information was not admissible under La. C.E. arts. 401, 402, 403, 608(B), or 609.1. Also on March 24, 2021, the State also filed a notice of disclosure, which provided that on or around May 25, 2011, Deputy Winn, a former Captain with the New Orleans Police Department ("NOPD"), was fired for his failure to notify NOPD investigators about his knowledge of what happened in the Henry Glover civil rights case. The State said, "NOPD officials found that Winn committed three violations of internal rules: two counts of neglect of duty and professionalism." The State indicated that the information was obtained by a google search and provided the website address for a news article. The State said it did not have any official records or documents such as a personnel file or court records.

In opposition to the State's motion, defendant argued that Deputy Winn was the first officer on the scene and did not simply have a limited role. Defendant

argued that Deputy Winn was fired from the NOPD for neglect of duty and lack of professionalism, the former of which, according to the NOPD's most recent disciplinary matrix, has a direct relationship with the processing of a crime scene. According to defendant, the actual events or occurrences which led to Deputy Winn's termination from the NOPD are directly related to his failure to adequately report observations made at the scene of a crime when it was his affirmative duty to do so. Defendant argued that the fact that Deputy Winn was fired for neglect of duty from a prior law enforcement agency is highly relevant and admissible under La. C.E. arts. 401, 402, and 403. Moreover, it was not the deputy's character that defendant intended to call into question, but rather an inquiry into his ability to perform the duties of a responding officer in conformity with the standards expected of a similarly situated officer. Lastly, defendant argued that pursuant to La. C.E. art. 406, he has the right to inquire as to habit and routine.

In response, the State argued that Louisiana courts have specifically addressed the admissibility of the prior conduct of police officers for the purpose of attacking that officer's credibility during trial and have consistently prohibited the use of such information in the absence of a criminal conviction. *See State v. Adams*, 11-1052 (La. App. 5 Cir. 5/16/13), 119 So.3d 46, *writ denied*, 13-1413 (La. 12/6/13), 129 So.3d 531, *State v. Hollins*, 97-627 (La. App. 5 Cir. 11/25/97), 704 So.2d 307, *writ denied*, 99-507 (La. 8/25/99), 747 So.2d 50, and *State v. Johnson*, 11-336 (La. App. 5 Cir. 2/14/12), 91 So.3d 365. In this regard, the State argued that Deputy Winn was never convicted of any crime, arrested, or under indictment for any alleged misconduct through his employment with the NOPD, and thus, any mention of his departure from the NOPD or allegations of bad acts or misconduct should be prohibited at trial.

The State's motion in *limine* came for hearing on April 6, 2021.[16] While Deputy Winn may have been the subject of disciplinary action during his tenure with the NOPD, because he was never convicted of any actual offenses, the district court ruled that no mention of Deputy Winn's termination of employment with the NOPD, or any facts related thereto, could be made in either opening statements or *voir dire*. Specifically, the district court ruled:

> [E]vidence of habitual acts is not admissible under code of Evidence 607 and 406. I think it's also very clear that only criminal convictions are allowed to attack credibility under 609.1. And specifically … comment (a) to 607 indicates that if the purpose and the intent of the information is to introduce evidence which would otherwise be inadmissible, then it is not allowed as well.
>
> What I am going to do, however, is hold open specific rulings as it arises in the trial. If for some reason, as with everything in evidence, you have to balance the probative value versus the prejudicial value. So I will say, from the outset, there will be no mention. *My ruling is that there will be no mention in opening or voir dire regarding Deputy Wynne's termination or the facts and circumstances involved in his termination*
>
> If there's information that develops through the course of trial which would make it more probative than prejudicial, I'll entertain a ruling at that time as to the specific evidence that's attempting to be admitted. But I am going to caution counsel to tread carefully when doing so. This is your first and only warning on that, tread carefully.
>
> *So we will leave open the specifics of evidence until such evidence is intended to be introduced at that time in trial.* [Emphasis added.]

In short, while any reference to Deputy Winn's termination of employment with the NOPD was prohibited during either opening statements or *voir dire*, the district court specifically deferred ruling on any evidence sought to be admitted during the trial, stating it would rule on the admissibility at the time such evidence

---

[16] At the hearing, the State clarified that it was not certain whether it would call Deputy Winn to testify at trial.

was sought to be admitted, after balancing the probative value of the evidence versus its prejudicial effect.

On appeal, defendant avers the district court erred in its ruling because, by denying his request to introduce evidence of Officer Jeffery Winn's previous acts of alleged unethical and dishonest behavior that occurred during his employment with the NOPD, it denied him his right to due process and the ability to present a defense. Defendant argues he had the constitutional right to confront Deputy Winn and attack his credibility, in light of the clear, extrinsic evidence tending to show that Deputy Winn was not credible. According to defendant, the district court's ruling ignored La. C.E. art. 406 and the final clause of La. C.E. art. 608(B); Deputy Winn's prior ethical lapses are relevant to determine his honesty; and the "only means to impeach his credibility was to introduce the fact that he was terminated." Defendant contends the district court's ruling denied him the right to present a defense and effectively confront his accusers.

To the contrary, the State argues the district court's ruling prohibited the defense from making references to Deputy Winn's prior employment *only* during opening statements and *voir dire*. As to any evidence sought to be admitted during the course of the trial, the State avers the district court deferred any ruling and stated that it would rule on the admissibility at the time the evidence was sought to be admitted, at which time it would balance the probative value of the evidence versus its prejudicial effect. The State contends that defense counsel's decision not to question Deputy Winn about his employment history with the NOPD, or attempt to impeach him or bring his credibility into question, was merely a trial strategy by defense. Moreover, because defense counsel did not object at trial regarding its inability to question Deputy Winn regarding his employment history with the NOPD, the State argues defendant now lacks standing to raise such as an assignment of error on appeal.

Both the Sixth Amendment to the United States Constitution and Article I, Section 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. *State v. Lirette*, 11-1167 (La. App. 5 Cir. 6/28/12), 102 So.3d 801, 813, *writ denied*, 12-1694 (La. 2/22/13), 108 So.3d 763. However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. *Id.* The trial court is afforded great discretion in evidentiary rulings and, absent a clear abuse of that discretion, rulings on admissibility of evidence will not be disturbed on appeal. *State v. Gonzales*, 21-685 (La. App. 5 Cir. 2/14/22), -- So.3d --, 2022 WL 533350.

La. C.E. art. 607(A) provides that the credibility of a witness may be attacked by any party, including the party calling him. La. C.E. art. 607(D) further provides that "extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness[.]" The admissibility of extrinsic evidence to impeach a witness' credibility, however, is subject to the relevancy balancing test of La. C.E. art. 607(D)(2), which requires the court to determine whether "the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." *Adams*, 119 So.3d at 53. Although La. C.E. art. 607(D) permits a party to attack the credibility of a witness through extrinsic evidence, this allowance is necessarily subject to both the relevancy balancing test of La. C.E. art. 607(D)(2) and the limitation set forth in La. C.E. art. 608(B), which provides:

> Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.

Here, the district court's ruling explicitly prohibited references to Deputy Winn's prior employment *only* during opening statements and *voir dire*. By doing so, the district court left open the opportunity for defense counsel to question Deputy Winn on cross-examination about his NOPD employment and termination, subject to the court's balancing of the probative value versus prejudicial effect. The trial transcript indicates that defense counsel never questioned Deputy Winn about his previous employment with the NOPD, however, nor did defense counsel attempt to attack his credibility. Additionally, there is no evidence in the record showing that Deputy Winn was ever convicted as a result of the prior NOPD incident. Instead, the record merely indicates that Deputy Winn's employment with the NOPD was terminated due to his actions in a previous, unrelated case. Moreover, nothing in the record suggests that Deputy Winn acted inappropriately in the instant case. Accordingly, under La. C.Cr.P. art. 608(B), we find the district court properly excluded evidence relating to the prior incident.

The record also indicates that Deputy Winn's employment with the NOPD was terminated in 2011 and the current investigation occurred in 2020. As such, we find the investigations were remote in time. As to evidence of the deputy's habits, we find that a single occurrence was not sufficient to prove that the detective had a habit or routine practice of being dishonest in investigations. Further, we find that there is little probative value in disclosing Deputy Winn's termination with the NOPD. For these reasons, we find no abuse of the district court's discretion. This assignment of error is without merit.

### Assignment of Error No. 4 – Failure to Appoint a Competency Commission

On July 14, 2021—three months after conviction and 10 days before sentencing—with new counsel enrolled, defense counsel filed a motion to appoint a sanity commission to determine defendant's competency and his ability to assist

counsel in this matter. In support, counsel referenced two letters sent by defendant to the district court following his conviction that counsel claims raise concerns, in addition to the fact that defendant was previously involuntarily hospitalized for mental illness.

In opposition, while acknowledging that a defendant's mental capacity to proceed may be raised post-conviction, the State argued that La. C.Cr.P. art. 643 requires a court to order a mental examination of a defendant *only* when it has reasonable grounds to doubt the defendant's capacity. According to the State, based upon the history of the instant case, and several other unrelated cases involving defendant, it was clear that defendant understood the proceedings against him and was able to assist his counsel. During trial, defendant appeared well-groomed, maintained his composure, and actively participated in his defense by taking and sharing notes, speaking quietly with his attorney during witness testimony, and appearing to offer suggestions to his attorney regarding questioning of witnesses. As to the letters defendant sent to the district court following his conviction, the State argued that they actually demonstrated that defendant comprehended the nature of the proceedings and actively discussed trial strategy and his appeal with his counsel.[17]

The State also noted that, prior to trial, defendant was questioned in court under oath by the chief public defender to assess his financial ability to obtain counsel and, at that time, defendant was clear, concise, and appeared to answer all of the questions posed to him without any indication that he did not understand the hearing or process, or the questions presented to him. Additionally, the State argued that the St. Charles Parish Clerk of Court online database evidenced that defendant was involved with at least ten other criminal matters not including traffic

---

[17] In the letters, defendant referenced having witnesses to clear his name, criticized some of the trial tactics of his attorneys, discussed the issuance of subpoenas to witnesses for the purpose of attacking the victim's credibility, referenced an attorney working on his appeal, and asked for leniency in sentencing.

from 1997 through April 2020, and that his competency to proceed was not raised or questioned in any of those proceedings.

Defendant's motion to appoint a sanity commission came for hearing on July 20, 2021. Defendant's sister, Mika Frickey, testified on his behalf stating that her contacts and conversations with defendant indicated to her that he was suffering from mental illness. Specifically, Mika relayed that defendant experienced severe depression in 2017 after his wife of 14 years left him. Once, after defendant indicated to Mika and her mom that he might harm himself, she had defendant involuntarily admitted to the hospital for a seventy-two-hour watch. Mika claimed that a family member told her that defendant had been prescribed medication to treat "bipolar or schizophrenia," but acknowledged that she had never seen him take any medication and simply assumed he stopped taking it. According to Mika, there is a history of mental illness in her family and that her paternal grandmother had paranoid schizophrenia. Mika stated that she noticed a decline in defendant's mental condition following his release.[18] Mika described several episodes of defendant experiencing paranoia and hearing voices, which seemed to exacerbate over time, and stated that defendant had delusions of being persecuted by others.

Rose Frickey, defendant's mother, also testified that she saw signs of paranoia in defendant, and that in the past year, he thought the CIA was putting devices in his head to make him hear voices. She described instances indicating to her that defendant was becoming increasingly paranoid and delusional. Rose testified that she believed defendant suffers from mental issues and that his mental health has declined in the last couple of years.

---

[18] The district court denied defense counsel's request to admit into evidence specific pages from defendant's uncertified medical records from his 72-hour stay at Thibodaux Regional Medical Center. Defense counsel's request to hold the motion open in order that the certified medical records could be obtained and introduced for the court's consideration was also denied.

As to the letters sent to the district court, defense counsel argued that the letters evidenced defendant's paranoia, and his disjointed thinking about irrelevant, random information such as drugs, prostitution, and women. Counsel indicated the testimony at the hearing was supported by the letters and that there was "more than enough evidence to meet the incredibly low threshold" for the district court to appoint a sanity commission.

In response, the State reiterated that there was no evidence that defendant lacked the mental capacity to proceed as evidenced by his testimony at the traversal hearing and defendant's behavior and participation during trial. As to defendant's letters to the district court, the State argued that defendant's reference to witnesses that could potentially clear his name, criticism of his attorney, discussion of witness subpoenas and his appeal, and request for leniency in his sentence and for probation, collectively demonstrate that defendant understands the proceedings.

Relying upon La. C.Cr.P. art. 643, the district court denied defendant's post-trial motion to appoint a sanity commission finding that defense counsel failed to present the requisite reasonable grounds to call into question defendant's capacity to proceed. The district court noted that defendant made his initial appearance in this matter on May 4, 2020, and in the subsequent eleven months, he made several court appearances, and was represented by two attorneys. Referencing the traversal, the district court stated that, "[a]t no point during that traversal did Mr. Frickey intimate to the court that he had any issues regarding his competency to proceed then or now." Moreover, the district court stated that defendant's letters did not begin arriving until weeks before sentencing and that no letters were sent to the court or anyone else during the eleven months the matter was pending. Given the curious timing of the letters, the district court found that there was no "reasonable ground to proceed under 643." Also, the court determined that the

family's belief that defendant had mental health issues did not constitute a reasonable ground upon which to order a mental examination. And, even though two family members testified that defendant's mental decline has existed for years, neither indicated that they had expressed any concern to his prior counsel. Lastly, the district court noted that not once between 2000 and 2021, in defendant's numerous appearances in court on the various charges brought against him, was a question regarding his mental health or competency to proceed ever raised.

On appeal, defendant avers the trial court abused its discretion by denying his motion to appoint a sanity commission. Defendant contends the trial court's ruling denies him his right to due process of law guaranteed under Article I, Section 2 of the Louisiana Constitution of 1974, and the Fifth and Fourteenth Amendments to the United States Constitution, because defense counsel established reasonable grounds to doubt defendant's competency to proceed with sentencing. Defense counsel claims that the numerous letters written by defendant to the district court prior to sentencing clearly evidence defendant's paranoia and disorganized thinking. Defendant's family history of mental illness, his previous involuntary hold for psychiatric evaluation and treatment, and the fact that he was suffering from delusions and paranoia, evidence the district court's error in refusing to appoint a sanity commission to formally evaluate defendant's mental health. We disagree.

Pursuant to La. C.Cr.P. art. 641, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." A defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. La. C.Cr.P. art. 642. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in

the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed. *Id.*

The trial judge is required to order a mental examination of the defendant *only* when there exists a reasonable ground to doubt the defendant's mental capacity to proceed. La. C.Cr.P. art. 643; *State v. Barnett*, 18-254 (La. App. 5 Cir. 4/3/19), 267 So.3d 209, 229. "Reasonable grounds to doubt the defendant's mental capacity to proceed" refers to information which, objectively considered, should raise a doubt about the defendant's competency and alert the court to the possibility that the defendant cannot understand the proceedings, appreciate the significance of the proceedings, or rationally aid his attorney in his defense. *State v. Wilt*, 14-823 (La. App. 5 Cir. 4/29/15), 170 So.3d 317, 325, *writ denied*, 15-1055 (La. 5/2/16), 206 So.3d 877.

Neither the United States Supreme Court, the Louisiana Supreme Court, nor the Louisiana Legislature, has set forth a standard procedure for a trial court to follow in making a preliminary determination whether it has a "reasonable ground to doubt the defendant's capacity to proceed." *State v. Willie*, 17-252 (La. App. 5 Cir. 12/20/17), 235 So.3d 1339, 1346-47. The Louisiana Supreme Court, in *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832, suggested that the trial court, in making a preliminary inquiry, could interview the defendant on the record or ask defense counsel to elaborate on the concerns of the defendant's mental capacity. *Willie*, 235 So.3d at 1347.

Ordering a mental examination falls within the sound discretion of the district court. *State v. Victor*, 13-888 (La. App. 5 Cir. 12/23/14), 167 So.3d 118, 127. The appointment of a sanity commission is not a perfunctory matter, a ministerial duty of the trial court, or a matter of right. *State v. Anderson*, 06-2987 (La. 9/9/08), 996 So.2d 973, 992. It is not guaranteed to every defendant in every case, but is one of those matters committed to the sound discretion of the court. *Id.*

If the court makes a preliminary inquiry, it need not necessarily order a sanity commission. *Willie*, 235 So.3d at 1346. The trial court's denial of a motion for appointment of a sanity commission will be reversed only for abuse of discretion. *State v. Barnett*, 18-254 (La. App. 5 Cir. 4/3/19), 267 So.3d 209, 229. There must be substantial doubt as to mental capacity before refusal to order an examination constitutes an abuse of the trial court's discretion. *Victor*, 167 So.3d at 127.

Here, we find nothing in the record that raises doubt that defendant understood and appreciated the significance of the proceedings, and was able to assist his attorney in his defense. Further, although the defense argues that the letters sent to the court after his conviction and immediately prior to sentencing, coupled with defendant's family history of mental health issues, necessitated a sanity commission, the record does not support this conclusion. While defendant's handwritten letters are admittedly difficult to read, he mentions trying to get probation, attempting to prove defendant's innocence or clear his name, that his case has had problems, that he is unsure if his attorney has a license to practice law, and that his attorney did not contact any of his witnesses. Defendant states that he asked his attorney to subpoena phone records and that "she told [him] she had all that ready." He acknowledges that "a great portion of [his] life" is in the judge's hands and indicates that he wants to get back to work. In two instances, defendant offers to move at least an hour away. In one letter, defendant thanks the judge and says he wants to explain something that did not come up at trial. Defendant asks the judge to give him a chance to get his life back and mentions losing time with his son. Defendant states, "I feel I been took advantage of cause my stupidity and incompetence in the legal system."

After reviewing defendant's letters, we find that while they contained irrelevant and questionable content, they also contained content demonstrating defendant's awareness of trial and his understanding that the judge would be

imposing a sentence. Additionally, the record shows that the trial judge observed defendant in court numerous times over a thirteen-month period, and observed him during the three-day trial, and found no suggestion during those proceedings that defendant lacked mental capacity.

We find no abuse of discretion by the district court in determining that reasonable grounds to doubt defendant's mental capacity are lacking. Thus, we find no error in the district court's decision not to appoint a sanity commission.

### *Assignment of Error No. 5 – Failure to Provide the Pre-Sentence Investigation Report ("PSI") to Defense Counsel Prior to Sentencing*

Prior to sentencing defendant, the district court ordered a PSI. Defense counsel later requested a copy of the PSI report. On July 20, 2021, a hearing was held to consider defendant's request for the PSI.[19] There, defense counsel acknowledged that although there is no absolute right for defendant to obtain and review the PSI, defendant has a due process right to rebut any false information contained in the report that may be detrimental to his sentencing. The district court denied defense counsel's request, stating that it was exercising its "discretion not to disclose [the PSI] at this time" on the basis that disclosure was not necessary. Instead, the district court indicated it would file the PSI under seal, "[a]nd at the appropriate time, if the defense feels that the sentence is obsessive [sic] and there are questions about what that PSI contains, you may take it up on appeal."

On appeal, defendant argues the district court abused its discretion by denying defense counsel's request for access to the PSI report, or disclosing the "gist" of the report, especially when the State allegedly received a copy. He claims his due process right to rebut any false information detrimental to sentencing mandated disclosure of the PSI. Defendant avers his counsel's request was timely, and that he objected to the PSI as containing false or misleading information.

---

[19] Also on July 20, 2021, the district court considered defendant's request to continue his sentencing hearing.

In opposition, the State argues that the district court made it clear that in sentencing defendant, it was most influenced by defendant's 20-year criminal history, not the PSI. Additionally, the State avers that defendant's criminal background could have been obtained by defense counsel through a public records search, and that a defendant is not a party to whom the release of a PSI is permitted. *See* La. C.Cr.P. art. 877. The State contends that defense counsel failed to allege with any particularity at the sentencing hearing that the PSI contained false information as required. The State posits that disclosure of the PSA is within the court's discretion, and the record here does not show that the district court abused that discretion. *State v. Lanieu*, 98-1260 (La. App. 1 Cir. 4/1/99), 734 So.2d 89, *writ denied*, 99-1259 (La. 10/8/99), 750 So.2d 962.

Pursuant to La. C.Cr. P. art. 877(A), a PSI is privileged. La. C.Cr.P. art. 877(A) mandates that the PSI shall not be disclosed directly or indirectly to anyone other than the parties enumerated in the Article. A defendant is not one of the enumerated parties to whom the release of a PSI is permitted. While La. C.Cr.P. art. 877(B) permits a sentencing court to advise a defendant and his counsel of the PSI factual contents and conclusions, the disclosure is limited to the sound discretion of the sentencing court. *See State v. Perrilloux*, 99-1314 (La. App. 5 Cir. 5/17/00), 762 So.2d 198, 205.

In order for an appellate court to review the effects of a PSI upon a defendant's sentence, the defendant must orally object, request a hearing, move to traverse, or offer countervailing information before or during the sentencing hearing. *State v. Milstead*, 95-1983 (La. App. 1 Cir. 9/27/96), 681 So.2d 1274, 1277-78, *writ denied*, 96-2601 (La. 3/27/97), 692 So.2d 392; *Lanieu*, 734 So.2d at 95.[20] When a defendant timely moves for disclosure of the PSI report, alleging

---

[20]     In *Lanieu*, *supra*, the defendant argued the trial court erred in refusing to give defense counsel access to the PSI prior to sentencing. At the sentencing hearing, the court stated that it reviewed the PSI and enumerated several reasons upon which it was basing the sentence. The defendant did not object to

with particularity that it contains false information detrimental to defendant, the district court errs if the contents (absent the source of confidential information) are not disclosed and the defendant is given an opportunity to contradict or explain substantially prejudicial information. *Id*; *see State v. Trahan*, 367 So.2d 752, 754 (La. 1978); *State v. Coleman*, 574 So.2d 477, 481 (La. App. 2d Cir. 1991).

Here, while defense counsel timely requested the PSI, or the "gist of the PSI," counsel failed to state with any particularity what information in the PSI may be false. Rather, counsel stated that "perhaps there might be some false information" in the PSI. Further, counsel stated that she did not know the probation officer who was interviewed for the PSI. On these facts, we find there was no reasonable ground for disclosure of the PSI to defendant. While the district court reviewed the PSI, it expressly stated that it did not rely on its contents when considering defendant's sentence, and defendant did not object to any of the district court's delineated reasons for his sentencing. Moreover, defendant received the statutory minimum term of imprisonment.

Additionally, while defendant contends the prosecution received a copy of the PSI, La. C.Cr.P. art. 877(A) specifically lists the prosecutor as a party to whom the PSI *shall* be disclosed. Neither defendant nor defense counsel are listed in La. C.Cr.P. art. 877(A). Rather, La. C.Cr.P. art. 877(B) states that the court *may* advise the defendant or his counsel of the factual contents and conclusions of any PSI report. The word "shall" is mandatory, and the word "may" is permissive. La. C.Cr.P. art. 5. For these reasons, we find no error in the district's refusal to disclose the PSI to defendant. This assignment of error lacks merit.

---

the reasons as being incorrect nor did he ask for an opportunity to rebut the reasons. The appellate court stated that defense counsel failed to allege with any particularity that the PSI contained false information detrimental to the defendant, and that the defendant failed to object to the judge's sentencing reasons as being false or ask for the opportunity to rebut the information. The appellate court concluded that it was unable to find that the district court erred in failing to disclose the contents of the PSI to the defendant.

***Assignment of Error No. 6 – Admission of La. C.E. art. 404(B) Evidence***

Defendant contends his due process rights were violated when the district court erroneously admitted La. C.E. 404(B) evidence of other alleged bad acts without conducting a *Prieur* hearing and without requiring the State to meet its exacting burden of proof for the admission of such evidence. We disagree.

On April 16, 2021, the State filed a notice of intent pursuant to La. C.E. art. 404(B), seeking to introduce into evidence at trial two of the numerous statements made by the victim during the emergency 9-1-1 call made the night of the incident; namely, "I've had trouble with him for years," and "He threatened to kill me several times."[21] Following an April 19, 2021 hearing on the State's notice of intent, the district court concluded that the statements at issue fall within *res gestae* and "are innocuous enough … to not be redacted." As such, the district court ruled that the evidence would be admissible at trial. *State v. Falkins*, 12-1654 (La. App. 4 Cir. 7/23/14), 146 So.3d 838, 851; *State v. Richard*, 05-1262 (La. App. 4 Cir. 6/21/06), 935 So.2d 727, 731. The district court noted that *res gestae* evidence is not subject to any advance notice requirements by the State. *Id*.

On appeal, defendant contends that admission of the victim's statement made in the 9-1-1 call—that defendant had previously attempted to kill him—constituted reversible error because it was not *res gestae*, the State's notice to admit the evidence was not adequate, the State failed to meet its burden of proof, and the evidence was more prejudicial than probative. Defendant argues that the State and the district court attempted to circumvent the reasonable notice requirement and the burden of proof requirement of *Prieur*.[22] Defendant also

---

[21] The State provided defense counsel with a copy of the 9-1-1 call on June 30, 2020. Both the discovery receipt and the full 9-1-1 call were admitted into evidence at the 404(b) hearing.

[22] *State v. Prieur*, 277 So.2d 126 (La. 1973).

challenges the timing of the State's notice and concludes that the admission of the evidence was not harmless error.

In response, the State argues the district court did not abuse its discretion in allowing the two statements made in the 9-1-1 call[23] into evidence at trial because the statements were *res gestae* and show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of a mistake or accident. Additionally, the State avers the incident at issue could not be placed in its proper context without the statements, as they evidenced the victim's feelings as he perceived the incident occurring. Further, the State argues that the statements pertain to the element of the offense regarding the foreseeability that human life would be endangered by defendant's actions. *State v. Taylor*, 01-1638 (La. 1/14/03), 838 So.2d 729, 743-45; *see also Falkins*, 146 So.3d at 851-52. The State further argues that the evidence was necessary for narrative completeness, and to place all of its evidence before the jury.

The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because the defendant has committed similar crimes in the past. *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 363, *writ denied*, 09-2565 (La. 5/7/10), 34 So.3d 860. *See also* La. C.E. art. 404(B)(1). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055. *See also State v. Prieur*, 277 So.2d at 128.

However, while the State may not admit evidence of other crimes to prove defendant is a person of bad character, evidence of prior crimes may be admitted if

---

[23] On appeal, defendant only takes issue with Mr. Breaux's statement that defendant previously tried to kill him, but originally defense counsel objected to that statement as well as Mr. Breaux's statement that he has had trouble with defendant for years.

the State establishes an independent relevance aside from proving the defendant's criminal character. *State v. Brown*, 17-348 (La. App. 5 Cir. 12/20/17), 235 So.3d 1314, 1323, *writ denied*, 18-158 (La. 11/5/18), 256 So.3d 276, *cert. denied*, -- U.S. --, 139 S.Ct. 2033, 204 L.Ed.2d 233 (2019). Such evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, formerly referred to as *res gestae*, that constitutes an integral part of the act or transaction that is the subject of the present proceeding. *See* La. C.E. art. 404(B)(1); *State v. Joseph*, 16-349 (La. App. 5 Cir. 12/14/16), 208 So.3d 1036, 1046, *writ denied*, 17-77 (La. 4/7/17), 218 So.3d 109.

*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *State v. Rodney*, 19-195 (La. App. 5 Cir. 10/23/19), 282 So.3d 395, 402-03. The *res gestae* doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances. *State v. Maize*, 16-575 (La. App. 5 Cir. 6/15/17), 223 So.3d 633, 649, *writ denied*, 17-1265 (La. 4/27/18), 241 So.3d 306. The test of *res gestae* evidence is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. *See State v. Carter*, 15-99 (La. App. 5 Cir. 7/29/15), 171 So.3d 1265, 1280, *writ denied*, 15-1618 (La. 10/17/16), 207 So.3d 1068.

The State must provide the defendant with notice and move for a hearing before trial if it intends to offer other crimes evidence. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1037. However, the State is not required to provide the defendant with notice before introducing *res gestae* evidence. *State v. Richardson*, 13-886 (La. App. 5 Cir. 5/28/14), 142 So.3d 314, 325, *writ denied*, 14-1353 (La. 2/13/15), 159 So.3d 461. *See* La. C.Cr.P. art. 720.[24] Even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *Ard*, 347 So.3d at 1055.

Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403. *Maize*, 223 So.3d at 649. Any inculpatory evidence, however, is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Rodgers*, 16-14 (La. App. 5 Cir. 10/26/16), 202 So.3d 1189, 1201, *writs denied*, 16-2189 (La. 9/15/17), 225 So.3d 479 and 16-2093 (La. 1/29/18), 235 So.3d 1104. As used in the balancing test, prejudice limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id*. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Smith*, 19-607 (La. App. 5 Cir. 1/21/20), 2020 WL 356010, at \*2, *writ denied*, 20-328 (La. 5/1/20), 295 So.3d 945.

---

[24] La. C.Cr.P. art. 720 states:

> Upon written motion of defendant, the court shall order the district attorney to inform the defendant of the state's intent to offer evidence of the commission of any other crime admissible under the authority of Code of Evidence Articles 404 and 412.2. However, that order shall not require the district attorney to inform the defendant of the state's intent to offer evidence of offenses which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding or other crimes for which the accused was previously convicted.

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013). Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(1) will not be disturbed. *Richardson*, 142 So.3d at 325.

Even if the district court erred in admitting the evidence at trial, the erroneous admission of other crimes evidence is subject to harmless error analysis. *Gatson*, 334 So.3d at 1039. In determining harmless error it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 29, *writ denied sub nom. State ex rel. Massey v. State*, 12-993 (La. 9/21/12), 98 So.3d 332.

Here, while defendant describes the statement made by the victim in the 9-1-1 call as stating that defendant "had previously tried to kill him," after reviewing the 9-1-1 call admitted into evidence, it is clear that the victim actually stated that defendant "*threatened* to kill him several times." [Emphasis added.] After reviewing the record, we find that the victim's mention of prior threats placed the incident at issue in its context. The victim's statement demonstrated that in the moment, he had reason to fear that defendant may try to kill him and demonstrated that it was foreseeable that human life might be endangered. The statement demonstrated the relationship between the victim and defendant, and was relevant to showing defendant's motive and intent. The victim did not further elaborate about defendant's prior threats at trial. While prejudicial, we find the brief mention in the 9-1-1 call is more probative than prejudicial.

At most, the admission of the statement in the 9-1-1 call is harmless error. The evidence at trial established the victim's familiarity with defendant and his ability to identify him at the time of the incident. Corporal Hebert stated he saw defendant's truck in the immediate area of the incident. Once the truck was stopped, the officers saw a shotgun in plain view across the passenger seat of defendant's truck. As such, we find the verdict was surely unattributable to the district court's admission of the statement about prior threats. This assignment of error lacks merit.

### *Assignment of Error No. 7 – Excessive Sentence*

Defendant contends that he was denied his due process rights when the court imposed an unconstitutionally excessive sentence. We find this assignment of error also lacks merit.

Defendant was convicted of discharging a firearm while committing aggravated criminal damage to property. La. R.S. 14:55 states that "[w]hoever commits the crime of aggravated criminal damage to property shall be fined not more than ten thousand dollars, imprisoned with or without hard labor for not less than one nor more than fifteen years, or both." Defendant was sentenced under La. C.Cr.P. art. 893.3, pursuant to the State's motion and the jury's determination that defendant discharged a firearm. La. C.Cr.P. art 893.3(C) provides that if the defendant discharged a firearm in the commission of the felony for which he was convicted, "the court *shall* impose a term of imprisonment of not less than ten years nor more than the maximum term of imprisonment provided for the underlying offense; however, if the maximum sentence for the underlying offense is less than ten years, the court shall impose the maximum sentence." [Emphasis added.] While defendant faced a sentence of ten-to-fifteen years, the district court imposed a ten-year sentence at hard labor, the minimum term of imprisonment.

At the sentencing hearing, the district court considered whether the mandatory minimum in this case was excessive and determined that it was not. We agree. Specifically, the district court stated:

> Mr. Frickey, the court did receive a PSI in this matter, which the court reviewed. However, what is driving the court the most in sentencing today are the litany of arrests over the course of your life, dating back 20 years, for crimes against people, violent crimes, including batteries, use of weapons, disturbing the peace. The court also takes note that, in particular, when you were put on probation for such a crime, you completed probation, did what was required, and then shortly thereafter was arrested again for a similar crime.
>
> The court sat through this trial. The court listened to the evidence. Of particular note, … the Court takes into account that the victim in this matter was a relative of yours. The identification that you were, in fact, the person who fired this weapon through their home was not questioned. This was not a case involving eyewitness disparity or a lineup. Your cousin identified you as the person who shot a weapon through his home.
>
> Secondly, the court takes note that within minutes -- moments, actually, less than five minutes, you were apprehended within a mile of the residence in this case with a weapon in your vehicle that was consistent with the damage that was done to this home.
>
> What is beyond disturbing to me is the fact that whatever led to this incident, you thought it was appropriate to shoot a weapon through the middle of a home, particularly that of your own relative.
>
> ***
>
> I have grappled with whether or not I think the mandatory minimum in this case is excessive, because there are other crimes out there that don't have such a minimum.
>
> However, in this case, I am drawn back to the fact that you stood in the back of a pickup truck and, without pause, fired a weapon into a home where you knew two people were and potentially children, had it been any other day of the week would have been present and could have been killed. It shows a complete disregard for

> human life. And so I don't think the mandatory minimum in this case is excessive.

Defendant filed a motion to reconsider sentence arguing that the mandatory minimum sentence was excessive, particularly in light of his history of mental illness. Defendant explained that this was his first felony conviction, he is a father of four, has life-long employment, and is supported by his family. He requested that his sentence be reconsidered, and that a sentence below the minimum be imposed pursuant to *State v. Dorthey*, 623 So.2d 1276 (La. 1993).[25]

The district court denied defendant's motion and issued written reasons, stating that *Dorthey* applies only to excessive sentences under the habitual offender statute and not to the firearm enhancement at issue here. At sentencing, the district court specifically found the mandatory minimum sentence was not excessive and provided written reasons for the sentence, as set forth above. Regarding defendant's alleged mental illness, the district court stated that the issue was only raised in last-minute motions supported by scant and unconvincing evidence that was never presented to the court during the entire pendency of the instant case—or in defendant's other criminal proceedings that spanned roughly fifteen years—until sentencing. Additionally, the district court found that defendant failed to show that the sentence imposed made no measurable contribution to acceptable goals of punishment, is not more than a purposeful imposition of pain and suffering, and is grossly out of proportion to the severity of the crime.

On appeal, defendant contends the trial court erred in imposing the statutorily required ten-year sentence, because the sentence is excessive and disproportionate to the crime charged, shocks the conscience, and serves no recognizable purpose, warranting a downward departure from the mandatory

---

[25] In *Dorthey*, 623 So.2d at 1281, the Louisiana Supreme Court held that a trial court has the authority to determine whether a mandatory minimum sentence is unconstitutionally excessive as applied to a particular defendant.

minimum sentence.  *See Dorthey*, *supra*.  Defendant argues the evidence is insufficient to prove he actually committed the offense.  He also argues the trial court erred when it prevented him from presenting evidence the victim had harmed him physically and that there was a prior history of the victim threatening him.  Defendant claims he was denied the ability to review the PSI—which he believes is devoid of his mental health history—and determine whether it included any mitigation information to support a deviation from the statutory minimum sentence.

The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment.  *State v. Nguyen*, 06-969 (La. App. 5 Cir. 4/24/07), 958 So.2d 61, 64, *writ denied*, 07-1161 (La. 12/7/07), 969 So.2d 628.  A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense, or imposes needless and purposeless pain and suffering.  *Id.* at 64.

In *Dorthey*, *supra*, the Supreme Court held that this extends to the minimum sentences mandated by the habitual offender law.  The *Dorthey* Court held that the district court must reduce a sentence to one not unconstitutionally excessive if the district court finds that the sentence mandated by the habitual offender law "makes no measurable contribution to acceptable goals of punishment" or is nothing more than "the purposeful imposition of pain and suffering," and "is grossly out of proportion to the severity of the crime."  Although *Dorthey* involved a mandatory enhanced sentence, this Court has applied the principles set forth in *Dorthey* to the review of mandatory life sentences other than those imposed under the habitual offender law.  *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1271, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372.

According to La. C.Cr.P. art. 881.4(D), appellate courts shall not set aside a sentence for excessiveness if the record supports the sentence imposed.  *State v.*

*Woods*, 20-73 (La. App. 5 Cir. 9/9/20), 303 So.3d 403, 406, *writ denied*, 21-27 (La. 2/17/21), 310 So.3d 1150. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society, and gauge whether the penalty is so disproportionate as to shock the court's sense of justice, while recognizing the trial court's wide discretion. *State v. Hankton*, 20-388 (La. App. 5 Cir. 7/3/21), 325 So.3d 616, 623, *writ denied*, 21-1128 (La. 12/7/21), 328 So.3d 425.

In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *Hayman*, 347 So.3d at 1043. There is no requirement that the factors be given any particular weight. *State v. Tracy*, 02-227 (La. App. 5 Cir. 10/29/02), 831 So.2d 503, 516, *writ denied*, 02-2900 (La. 4/4/03), 840 So.2d 1213. The trial judge is afforded great discretion in imposing a sentence, and sentences will not be set aside as excessive absent clear abuse of that broad discretion. *State v. Brown*, 01-41 (La. App. 5 Cir. 5/30/01), 788 So.2d 694, 704-05.

(1) *The Nature of the Crime*

Here, defendant fired a shotgun through a glass door at night when, according to Officer Winn, there was a stay-at-home order related to COVID-19 in effect. Moreover, the victim was defendant's first cousin with whom he grew up. While it is unclear whether defendant knew that the victim's children lived with him part-time, there were cars in the victim's driveway at the time of the incident. Ms. St. Amant, whom defendant did not know, also resided in the home, and her son lived there half of the time. The victim testified at trial that the incident had a negative effect on his life, that he feels constantly threatened, and that it has negatively affected his relationships. He explained that Ms. St. Amant no longer felt comfortable in his home and moved out. Additionally, the mother of his

children did not feel comfortable with them being at the residence because of the possibility that a similar incident could happen again.[26]

(2) *The Nature and Background of the Offender*

The record shows that defendant is a first-felony offender and has four children and four grandchildren. The record also evidences that defendant has a history of arrests for "crimes against people, violent crimes, including batteries, use of weapons, disturbing the peace," and that he was put on probation for a crime and was arrested again shortly after completing that probation.

(3) *Sentences Imposed for Similar Crimes*

While our research revealed no cases involving a defendant sentenced pursuant to La. R.S. 14:55 and La. C.Cr.P. art. 893.3(C), we note that other appellate courts have upheld the same or greater sentences for aggravated criminal damage to property, even when a weapon was not involved. *See State v. Price*, 47,282 (La. App. 2 Cir. 8/8/12), 103 So.3d 536, 541 (affirming as not unconstitutionally excessive the defendant's twelve-year sentence for aggravated criminal damage to property for crashing his vehicle into his wife's car, while she was inside of it, after considering the defendant's criminal history, his probationary status at the time of the instant crime, and the district court's statement that he was likely to reoffend if not incarcerated); *State v. McKinney*, 19-380 (La. App. 5 Cir. 12/26/19), 289 So.3d 153, 166 (affirming a ten-year sentence at hard labor and a $5,000 fine for aggravated criminal damage to property, when the defendant shot numerous bullets into a vehicle resulting in significant damage and evidencing a

---

[26]     The information contained within the PSI report, which was reviewed by the district court prior to sentencing and placed under seal, substantiates this information. Because defendant raises a claim of excessive sentence on appeal, this Court can review the PSI as permitted by La. C.Cr.P. art. 877(C). *See State v. Youngblood*, 18-445 (La. App. 5 Cir. 5/22/19), 274 So.3d 716, 743, *writ granted, cause remanded*, 19-1160 (La. 6/3/20), 296 So.3d 1022, and *on reconsideration*, 18-445 (La. App. 5 Cir. 12/9/20), 308 So.3d 417. This Court has now also reviewed the PSI.

complete disregard for the safety of the victim or others in the vicinity of the crime scene).[27]

Based on the totality of the record, we find the district court's imposition of the statutory minimum sentence of ten years imprisonment was not unconstitutionally excessive and is supported by the record. This assignment of error lacks merit.

### *Assignment of Error No. 8 – Errors Patent Review*

In his final assignment of error, defendant requests review of the entire record for errors patent. However, this Court routinely reviews the record for errors patent in accordance with La. C.Cr.P. art. 920;[28] *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990), regardless of whether defendant makes such a request.

In conducting an errors patent review, we find there is a discrepancy between the transcript and the sentencing minute entry. Although the minute entry reflects that defendant was properly advised of the time period for seeking post-conviction relief pursuant to La. C.Cr.P. art. 930.8, the transcript does not show a proper advisal as to post-conviction relief. Where there is a discrepancy between the transcript and the minute entry, the transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

If a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the

---

[27]     *See also State v. Carter*, 11-758 (La. App. 5 Cir. 5/31/12), 96 So.3d 1283 (finding the defendant's 20-year enhanced sentence as a second-felony offender was imposed. This Court found the defendant's enhanced sentence was not unconstitutionally excessive where the defendant struck a police vehicle with his own vehicle as he attempted to flee from the officers, he had an extensive criminal history, and was on home incarceration at the time of the charged); and *State v. Thomas*, 51, 364 (La. App. 5/17/17), 223 So.3d 125, *writ denied*, 17-1049 (La. 3/9/18), 238 So.3d 450 (affirming a ten-year sentence following a defendant's guilty plea where the sentence was within the statutory range and the plea-sentencing cap, and the charge arose out of the defendant's violent action of driving a car into a house where an individual was sitting).

[28]     La. C.Cr.P. art. 920(2) states that an error patent is "[a]n error that is discoverable by an inspection of the pleadings and proceedings and without inspection of the evidence."

defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Becnel*, 18-549 (La. App. 5 Cir. 2/6/19), 265 So.3d 1017, 1022. Accordingly, by way of this opinion, defendant is advised that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See State v. Barnett*, 18-254 (La. App. 5 Cir. 4/3/19), 267 So.3d 209, 235.

### CONCLUSION

For the foregoing reasons, finding no reversible error, defendant's conviction and sentence are affirmed.

### CONVICTION AND SENTENCE AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MARCH 1, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-261**

### E-NOTIFIED
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE CONNIE M. AUCOIN (DISTRICT JUDGE)
LOUIS G. AUTHEMENT (APPELLEE)      AUTUMN A. TOWN (APPELLANT)      GRAHAM L. BOSWORTH (APPELLANT)

### MAILED
HON. HONORABLE JOEL T. CHAISSON, II
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-NINTH JUDICIAL
DISTRICT COURT
POST OFFICE BOX 680
HAHNVILLE, LA 70057